STATE OF CONNECTICUT *v.* GRAYLON SHANNON
(13387)
(13388)

PETERS, C. J., HEALEY, CALLAHAN, GLASS and SANTANIELLO, Js.

Argued May 2—decision released August 1, 1989

*A. Paul Spinella,* for the appellant (defendant).

*John O'Meara,* deputy assistant state's attorney, with whom were *Warren Maxwell,* assistant state's attorney, and, on the brief, *John M. Bailey,* state's attorney, for the appellee (state).

GLASS, J. The charges against the defendant, Graylon Shannon, stem from the murders of Gaspar Munoz on February 27, 1984, and Leon Walker on March 19, 1984. As to each of these incidents, the state charged the defendant with one count of murder in violation of General Statutes § 53a-54a,[1] one count of felony mur-

---

[1] "[General Statutes] Sec. 53a-54a. MURDER DEFINED. AFFIRMATIVE DEFENSES. EVIDENCE OF MENTAL CONDITION. CLASSIFICATION. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a per-

der in the course of committing a robbery in violation of General Statutes § 53a-54c,[2] one count of felony murder in the course of committing a kidnapping in violation of General Statutes § 53a-54c, and one count of conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (4).[3] After a jury trial, the defendant was found guilty on all counts in both cases, and received a total effective sentence of sixty years imprisonment.

On appeal, the defendant claims that this court should grant him a new trial on all of the convictions for the

son in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a), on the question of whether the defendant acted with intent to cause the death of another person.

"(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony."

[2] "[General Statutes] Sec. 53a-54c. FELONY MURDER. A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, sexual assault in the first degree with a firearm, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (A) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (B) was not armed with a deadly weapon, or any dangerous instrument; and (C) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (D) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

[3] "[General Statutes] Sec. 53a-48. CONSPIRACY. RENUNCIATION. (a) A person is guilty of conspiracy when, with intent that conduct constituting a

following reasons: (1) the state violated his constitutional rights under *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), by failing to disclose exculpatory evidence;[4] (2) the trial court erred in finding probable cause in light of the fact that the subsequent trial testimony of the state's only eyewitness deviated from his probable cause testimony, and because the state failed to disclose material exculpatory evidence prior to the probable cause hearing; and (3) the trial court's charge to the jury unfairly emphasized the state's evidence to such a degree that there was a reasonable possibility that the jury was misled. We find no error.

In regard to the murder of Gaspar Munoz, the jury could reasonably have found the following facts. At approximately 10 p.m., on February 27, 1984, Munoz left his cousin's home in Bloomfield. At 10:30 p.m.,

crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy.

"(b) It shall be a defense to a charge of conspiracy that the actor, after conspiring to commit a crime, thwarted the success of the conspiracy, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose."

"[General Statutes] Sec. 53a-134. ROBBERY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm; except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged. Nothing contained in this subdivision shall constitute a defense to a prosecution for, or preclude a conviction of, robbery in the second degree, robbery in the third degree or any other crime."

[4] In his brief the defendant asserts, as a separate issue, that the trial court erred in failing to grant his petition for a new trial pursuant to General Statutes § 52-270. The defendant conceded at oral argument, however, that this issue is indistinguishable from the *Brady* issue addressed above.

Munoz stopped his car at a Connecticut Bank and Trust office on Farmington Avenue in Hartford to use an automated teller machine. At the same time that Munoz was using the teller machine, the defendant, Ronnie Walker, Keith Johnson and Tyrone "Cowboy" Carmichael were riding along Farmington Avenue in Ronnie Walker's car with the avowed purpose of committing a robbery. When the occupants of the car noticed Munoz at the teller machine, the defendant told Ronnie Walker to pull over. The defendant and Carmichael then exited the car, grabbed Munoz from behind and took his money. They put Munoz in his own car and told Ronnie Walker to follow them in his car. The defendant drove Munoz to the area of Mark Twain Drive in Hartford. At this point, the defendant and Carmichael dragged Munoz out of his car and into a wooded area. The defendant then fatally shot Munoz in the back of the head.

In regard to the murder of Leon Walker, the jury could reasonably have found the following facts. In the early morning hours of March 19, 1984, Leon Walker was on duty as a cab driver for the Yellow Cab Company. At approximately 3:15 a.m. the company received a call from someone who wanted to be picked up at Hillside and Bonner Streets in Hartford and brought to Barbour Street in Hartford. The cab company dispatcher sent Leon Walker to respond to this call. At some point thereafter, the defendant and Johnson got into Leon Walker's cab. Ronnie Walker followed the cab in his car as the cab proceeded to the area of Pope Park in Hartford. In Pope Park, the cab stopped, and the defendant, Johnson and Leon Walker all got out. The defendant then threw Leon Walker against the cab. Leon Walker attempted to run. The defendant chased and caught him, however, and threw him against a fence. The defendant then fatally shot Leon Walker in the back of the head. The defendant and Johnson there-

after removed a cigar box from Leon Walker's cab, and returned to Ronnie Walker's car, whereupon the three men drove away.

The state's primary witnesses at trial were Edward Dailey, Michael Jiles and Ronnie Walker. Dailey testified that while he was in custody with the defendant in Hartford, in December, 1985, the defendant had told him not only that he was involved in both crimes, but that he had shot both Munoz and Leon Walker. Jiles testified that in January, 1986, while in custody in Hartford, he similarly had heard the defendant admit to his involvement in both crimes, and in particular to his shooting of both victims.

Ronnie Walker testified at trial that, on the night of the Munoz murder, he, the defendant, Johnson and Carmichael were driving in his car in Hartford for the express purpose of committing a robbery. He stated that the car's occupants noticed Munoz at a bank teller machine on Farmington Avenue, that the defendant and Carmichael got out of his car and forced Munoz into his own car, that the cars then were driven to an area off Mark Twain Drive, and that the defendant and Carmichael dragged Munoz out of his car and into a wooded area. In regard to the Leon Walker murder, Ronnie Walker testified that the defendant and Johnson got into Leon Walker's cab, that the cab then proceeded to an area in the south end of Hartford while he followed the cab in his own car, that the cab eventually stopped and Leon Walker attempted to run, and that the defendant chased after Leon Walker and eventually threw him up against a fence. Ronnie Walker further testified that after he had lost sight of the defendant and Leon Walker, he heard a gunshot, and the defendant then returned to view and got into his car with Johnson.

In addition, Jiles' and Dailey's testimony corroborated significant details described by Ronnie Walker in his trial testimony. For example, Jiles testified that the defendant stated that he and Carmichael forced Munoz into his own car and then told Ronnie Walker to follow them. Dailey testified that the defendant had told him that the cab driven by Leon Walker was driven to the area of Pope Park where the defendant thereafter shot him.

Ronnie Walker's trial testimony, however, contained numerous inconsistencies in relation to four statements he had previously given to the police and the state's attorney's office, and in relation to his testimony at the probable cause hearing. At the probable cause hearing Ronnie Walker stated that the four statements he previously had given were false and that his present testimony was the truth. He also testified at that hearing that he saw the defendant shoot and kill Leon Walker. He stated that on March 19, 1984, the date of Leon Walker's murder, he first encountered the defendant and Keith Johnson at the home of the defendant's sister, Vicky White, on Barbour Street in the north end of Hartford, and that White called for Leon Walker's cab from the Barbour Street address. Ronnie Walker further testified that after the defendant had entered the cab with Johnson outside the Barbour Street address, the defendant knocked out Leon Walker with a lug wrench. He stated that he followed the cab in his own car to the south end of Hartford, where he saw the defendant shoot Leon Walker after a brief scuffle in which Leon Walker had drawn a knife.

At trial, however, Ronnie Walker varied the details of his version of these events. In particular, he testified that the first time he saw the defendant and Johnson on the night of Leon Walker's murder was upon departing from a party in the south end of Hart-

ford. He testified that he saw the defendant and Johnson already in Leon Walker's cab and that he followed the cab in his car to the spot where Leon Walker was killed. According to his trial testimony, however, he did not actually see the defendant pull the trigger, but instead saw the defendant and Leon Walker disappear from sight. He testified that he then heard a gunshot, that the defendant returned to view, and that the three men drove away.[5]

Defense counsel brought out these and several other inconsistent statements on cross-examination. For example, Ronnie Walker contradicted at trial prior statements that an individual named William Johnson

---

[5] On direct examination at trial Ronnie Walker testified as follows:

"Q. Then what happened?

"A. Then he shot him.

"Q. Who's he?

"A. Graylon.

"Q. Shot who?

"A. Leon Walker.

"Q. Where?

"A. In the back of the head.

"Q. Did you see it?

"A. Yes.

"Q. Did you see the gun?

"A. No.

"Q. Did you hear it?

"A. Yes."

On cross-examination at trial Ronnie Walker testified as follows:

"Q. And what did you do when this chase began?

"A. I was sitting in my car.

"Q. And did you sit in your car throughout the time that the chase took place?

"A. Yes.

"Q. And then you heard a shot?

"A. Yes.

"Q. Did you actually see the shot being fired?

"A. No.

"Q. Did you see Leon Walker again that night?

"A. No.

"Q. Did you go down and look at the body?

"A. No."

was involved in both murders. Regarding the Munoz murder, Ronnie Walker had stated previously that the defendant and Keith Johnson had forced Munoz into the car, rather than the defendant and Carmichael, as he testified at trial. Further, at one time he told investigators that he had actually witnessed the defendant shoot Munoz, whereas at trial he denied seeing the shooting. Regarding the Walker murder, he had previously disclosed that the call for Walker's cab had been made from the apartment of a woman named Brenda Browning, a claim he contradicted with one story at the probable cause hearing and yet another at trial. Further, he had also told police prior to trial that he had witnessed the defendant partially undress and sexually assault Leon Walker after the shooting, although at trial he had claimed that he had not witnessed such events. In all, defense counsel placed into evidence more than fifteen inconsistent statements in regard to Ronnie Walker's trial testimony.

In addition, the defendant called Leon Harris as a witness. Harris testified that in December, 1985, he overheard Ronnie Walker state that the defendant "didn't know nothing about" the murders but that he was "going along with it" because the defendant had been charged with the crimes. The defense also called Carmichael, who specifically denied any involvement in the crimes as testified to by Ronnie Walker.

I

The defendant first contends that the state failed to disclose "three distinct, exculpatory sets of evidence to the defense" in violation of the defendant's constitutional rights as set forth in *Brady* v. *Maryland,* supra, and in violation of General Statutes § 54-86c.[6] In par-

[6] "[General Statutes] Sec. 54-86c. DISCLOSURE OF EXCULPATORY INFORMATION OR MATERIAL. (a) Not later than thirty days after any defendant enters a plea of not guilty in a criminal case, the state's attorney, assist-

ticular, the defendant asserts that the state withheld: (1) a statement made by John Hightower, a potential witness; (2) the dispatch records of the Yellow Cab Company from the night of Leon Walker's murder; and (3) a police report that allegedly indicated that a man named Alvin Clark was a suspect in the Leon Walker homicide.

## A

John Hightower's statement concerns Ronnie Walker. Hightower, Ronnie Walker's former roommate, made a statement to attorney Jacob Wieselman, counsel for one of the coparticipants, Keith Johnson. Hightower told Wieselman that Ronnie Walker had become increasingly withdrawn and erratic in his moods following the Munoz and Leon Walker homicides, and that Ronnie Walker stated that, while the defendant was actively involved in both murders, it was he who actually held the gun and shot both victims. In

---

ant state's attorney or deputy assistant state's attorney in charge of the case shall disclose any exculpatory information or material which he may have with respect to the defendant whether or not a request has been made therefor. If prior to or during the trial of the case, the prosecutorial official discovers additional information or material which is exculpatory, he shall promptly disclose the information or material to the defendant.

"(b) Any state's attorney, assistant state's attorney or deputy assistant state's attorney may request an ex parte in camera hearing before a judge, who shall not be the same judge who presides at the hearing of the criminal case if the case is tried to the court, to determine whether any material or information is exculpatory.

"(c) Each peace officer, as defined in subdivision (9) of section 53a-3, shall disclose in writing any exculpatory information or material which he may have with respect to any criminal investigation to the prosecutorial official in charge of such case."

This statute "reflect[s] the constitutional obligation of a prosecutor to disclose all material evidence favorable to an accused in his possession, an obligation that exists without statutory . . . mandates." *State* v. *Packard,* 184 Conn. 258, 277, 439 A.2d 983 (1981). Therefore, if the state's constitutional duty to disclose exculpatory evidence pursuant to *Brady* has not been violated, then neither has § 54-86c been violated.

addition, Hightower indicated to Wieselman that he knew the location of the murder weapon and Ronnie Walker's car.

On September 10, 1986, Wieselman reported Hightower's statement to an unspecified assistant state's attorney and to Superior Court Judge Herbert Barall. Thereafter, inspector Joseph E. Hammick of the Hartford state's attorney's office spoke with Hightower on several occasions. Hightower told Hammick that he knew the locations of the gun and car, but refused to disclose either unless the state lowered his bond on an unrelated case so that he could be released from custody and gather the evidence himself. The state refused to meet Hightower's demand, and he thereafter refused to cooperate with the state.

Prior to trial, the defendant filed two motions for disclosure of exculpatory information. In addition, the defendant made an oral request for memos and information concerning Ronnie Walker's previous statements. The state failed to disclose to the defense any information regarding John Hightower's statement until March 19, 1987, two weeks after the completion of the trial. Upon discovery of the Hightower statement, the defendant filed a motion for a new trial, and on March 23, 1987, the trial court held an evidentiary hearing on the defendant's motion. Hightower, Wieselman and Hammick testified regarding the Hightower statement. On March 24, 1987, the trial court denied the defendant's motion. It ruled that the Hightower statement constituted cumulative impeachment evidence and therefore was not material. It found that, even if credible, the Hightower statement could only have been used to impeach Ronnie Walker's testimony and could not have been used for the truth of the matters asserted, i.e., that Ronnie Walker shot both Munoz and Leon Walker. The trial court concluded that, given the considerable amount of impeachment testimony

that the defense had already introduced, the state's nondisclosure of the Hightower statement did not entitle the defendant to a new trial.

Under *Brady* v. *Maryland,* supra, 87, "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." To establish a *Brady* violation the defense bears the burden of demonstrating: " '(1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that it was material.' " *Demers* v. *State,* 209 Conn. 143, 150, 547 A.2d 28 (1988), quoting *State* v. *Milner,* 206 Conn. 512, 539–40, 539 A.2d 80 (1988); see, e.g., *Moore* v. *Illinois,* 408 U.S. 786, 794–95, 92 S. Ct. 2562, 33 L. Ed. 2d 706, reh. denied, 409 U.S. 897, 93 S. Ct. 87, 34 L. Ed. 2d 155 (1972); *State* v. *Monteeth,* 208 Conn. 202, 213, 544 A.2d 1199 (1988); *State* v. *Pollitt,* 205 Conn. 132, 141–42, 531 A.2d 125 (1987); *State* v. *Simms,* 201 Conn. 395, 405–406, 518 A.2d 35 (1986).

It is undisputed that the state failed to disclose the Hightower statement.[7] Regarding the issue of "favorability," the state contends that although the Hightower statement contained exculpatory information, it also directly inculpated the defendant in the felony murder and conspiracy charges, since Hightower portrayed the defendant as being an active participant in both crimes. The state concedes, however, that the statement could have been used by the defense as impeachment evidence during cross-examination of Ronnie Walker. The

---

[7] There is no assertion by the defendant, however, that the failure to disclose was intentional or due to any bad faith on the part of the state. During oral argument on the defendant's motion for a new trial, defense counsel stated: "I don't think that there is for a moment, in State's Attorney Warren Maxwell's mentality or bearing or conduct any intentional desire to subvert the process of law, and therefore I make no such imputation."

United States Supreme Court and this court have both held that impeachment evidence as well as substantive exculpatory evidence falls within *Brady's* definition of evidence "favorable" to an accused. *United States* v. *Bagley,* 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); *Giglio* v. *United States,* 405 U.S. 150, 154–55, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972); *State* v. *Pollitt,* supra, 142. Consequently, we conclude that the Hightower statement was "favorable" to the defendant.

Regarding the third prong of the *Brady* criteria, the defendant asserts that the trial court erred in concluding that the Hightower statement was not material. He claims that the Hightower statement was admissible not only to impeach Ronnie Walker's testimony, but also to establish that Ronnie Walker, and not the defendant, actually shot both victims. He also contends that the Hightower statement was material because it could have led to the discovery of physical evidence— the murder weapon and Ronnie Walker's car—that could have proven exculpatory for the defendant. We disagree with the defendant's arguments.

In *United States* v. *Agurs,* 427 U.S. 97, 108, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976), the United States Supreme Court stated that "the prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." See *State* v. *Pollitt,* supra. Under *United States* v. *Bagley,* supra, 682, "[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." In analyzing a *Brady* claim, the courts "must avoid concentrating on the suppressed evidence in isolation. Rather, we must place it in the context of the

entire record. Evidence that may first appear to be quite compelling when considered alone can lose its potency when weighed and measured with all the other evidence, both inculpatory and exculpatory. Implicit in the standard of materiality is the notion that the significance of any particular bit of evidence can only be determined by comparison to the rest." *Trujillo* v. *Sullivan,* 815 F.2d 597, 613 (10th Cir.), cert. denied, 484 U.S. 929, 108 S. Ct. 296, 98 L. Ed. 2d 256 (1987); see *State* v. *Pollitt,* supra, 143. Further, "[t]he determination of materiality has been said to be 'inevitably factbound' and like other factual issues is committed to the trial court in the first instance." *State* v. *Pollitt,* supra, 147. "There is a difficulty inherent in measuring the effect of nondisclosure in the course of a lengthy trial with many witnesses and exhibits . . . this lack of certitude suggests deference by a reviewing court especially in the weighing of evidence." Id., 149; see *United States* v. *Kelly,* 790 F.2d 130, 136 (D.C. Cir. 1986); *United States* v. *Pflaumer,* 774 F.2d 1224, 1230 (3d Cir. 1985), cert. denied, 475 U.S. 1046, 106 S. Ct. 1263, 89 L. Ed. 2d 572 (1986). Thus, the trial court's decision regarding the defendant's petition for a new trial as a result of a *Brady* violation will be overturned only upon a finding of "clear abuse of discretion." *Demers* v. *State,* supra, 148; *Wetzel* v. *Thorne,* 202 Conn. 561, 564–65, 522 A.2d 288 (1987); *Asherman* v. *State,* 202 Conn. 429, 434, 521 A.2d 578 (1987).

We conclude that the trial court did not abuse its discretion in determining that the impeachment value of the Hightower statement was merely cumulative. See, e.g., *United States* v. *Jackson,* 780 F.2d 1305, 1310–11 (7th Cir. 1986); *United States* v. *McKenzie,* 768 F.2d 602, 610 (5th Cir. 1985), cert. denied, 474 U.S. 1086, 106 S. Ct. 861, 88 L. Ed. 2d 900 (1986). The jury was presented with a plethora of impeachment evidence pertaining to Ronnie Walker's credibility. Defense

counsel cross-examined Ronnie Walker concerning some fifteen prior inconsistent statements. Moreover, Leon Harris testified for the defendant that Ronnie Walker previously had said that the defendant knew nothing about the two murders. Any evidence that Ronnie Walker told John Hightower yet another version of events would have presented merely one more in a string of inconsistencies of which the jury was aware. We conclude that the trial court did not clearly abuse its discretion in finding that it was not reasonably probable that the defendant's use of Hightower's statement to impeach further Ronnie Walker's testimony would have affected the outcome of the trial.

We also disagree with the defendant's assertion that the Hightower statement would have been admissible to prove that Ronnie Walker actually had shot both victims. The trial court ruled that because the Hightower statement was hearsay, it could only have been used as impeachment evidence and could not have been used for the truth of the matters asserted. Although the defendant claims that the statement would have been admissible for the truth of the matters asserted therein, he did not except to the trial court's characterization of the statement as hearsay. Further, on appeal, he has neither challenged the trial court's conclusion that the statement was hearsay, nor suggested any applicable exception to the hearsay rule.

Finally, we disagree with the defendant's claim that the Hightower statement was material because he could have used it to develop other admissible evidence helpful to his defense. The defendant asserts that, had he known of the Hightower statement, he could have contacted Hightower in an effort to locate the gun used in the crimes, as well as Ronnie Walker's car. The record clearly indicates, however, that although Hightower claimed to know the location of the gun and Ronnie Walker's car, he refused to cooperate with the state's

investigators by disclosing the locations of either. This court has stated that the " 'mere *possibility* that an item of undisclosed evidence *might* have helped the defense or *might* have affected the outcome of the trial . . . does not establish "materiality" in the constitutional sense.' " (Emphasis in original.) *State* v. *Pollitt,* supra, 149, quoting *State* v. *Mak,* 105 Wash. 2d 692, 704–705, 718 P.2d 407, cert. denied, 479 U.S. 995, 107 S. Ct. 599, 93 L. Ed. 2d 599 (1986); see *United States* v. *Agurs,* supra, 109–10.[8]

For Hightower's statement that he knew the location of the gun and car to have aided the defendant, the following scenario would have had to have taken place. Hightower would have had to agree to tell the defense the exact location of the evidence;[9] the gun, the car, or both would then have had to have been found; and that evidence would then have had to prove to be not only exculpatory, but material in terms of the *Bagley* standard. We conclude that this chain of events is so speculative that it presents only the remotest possibility that the Hightower statement would have affected the outcome of the trial. *State* v. *Pollitt,* supra. We conclude, therefore, that the trial court did not err in refusing to grant the defendant a new trial on the ground of the state's failure to disclose the Hightower statement.

### B

The defendant next claims that the prosecution also suppressed the dispatch records of the Yellow Cab

---

[8] Furthermore, this court has noted that "[t]here is no constitutional requirement that the prosecution . . . make a complete and detailed accounting to the defense of all police investigatory work on a case." *State* v. *Packard,* 184 Conn. 258, 278, 439 A.2d 983 (1981).

[9] Given that Hightower's condition for cooperating was that his bond be lowered so that he could gather the evidence himself, it is unlikely that he would have cooperated with the defense as the defense could not have met his condition.

Company from the night of Leon Walker's murder. He asserts that he could have used this evidence to impeach the testimony of both Dailey and Jiles that the defendant told them that Leon Walker's cab was called from Vicky White's house. We conclude, however, that there was no suppression of the cab company records by the state. The state disclosed the cab company records by introducing them at trial. This court has stated that " '[e]vidence . . . that is disclosed, even if during trial, is not considered suppressed as that term is used in *Brady*.' " *State* v. *Simms, supra,* 407, quoting *State* v. *Dolphin,* 195 Conn. 444, 455–56, 488 A.2d 812, cert. denied, 474 U.S. 833, 106 S. Ct. 103, 88 L. Ed. 2d 84 (1985); see *Demers* v. *State, supra,* 154. Further, evidence that is equally available to the defendant, or which could have been discovered through reasonably diligent research, is not considered suppressed for the purposes of *Brady.* See *State* v. *Simms, supra,* 407–408; see also *Lugo* v. *Munoz,* 682 F.2d 7, 9–10 (1st Cir. 1982). In this case, the defendant was aware prior to trial that Leon Walker was working as a cab driver when he was murdered on March 19, 1984. Information from the cab company concerning Leon Walker was as available to the defendant as it was to the state. We conclude, therefore, that the cab company records from the night of Leon Walker's murder were not suppressed.

C

The defendant further claims that the state suppressed a police report that identified Alvin Clark as a suspect in the homicide of Leon Walker. As with the cab company records, however, there was no suppression of this report by the prosecution. The defense learned of this police report during the second week of jury selection. While it is true that *Brady* requires disclosure of exculpatory information "at a time when it can be used"; *State* v. *Pollitt,* 199 Conn. 399, 414, 508 A.2d 1 (1986); " '[n]o denial of due process occurs

if *Brady* material is disclosed . . . in time for its effective use at trial.' " Id., quoting *United States* v. *Higgs,* 713 F.2d 39, 44 (3d Cir. 1983), cert. denied sub nom. *Kemp* v. *United States,* 464 U.S. 1048, 104 S. Ct. 725, 79 L. Ed. 2d 185 (1984). The defendant has not demonstrated any prejudice stemming from the timing of the disclosure of the police report. After disclosure of the report, the defendant did not request a continuance to investigate further Clark's potential involvement. Additionally, the defendant presented evidence at trial based on the police report in an attempt to establish Clark as a third party suspect. The defendant argued this theory of defense to the jury, and the court instructed the jury regarding the defendant's third party culpability evidence. We therefore conclude that the police report pertaining to Clark was not suppressed under *Brady.*

## II

The defendant next claims that the trial court erred in finding probable cause that he had committed the offenses charged in the state's information. He asserts that because one of the state's key witnesses, Ronnie Walker, later "recanted" his probable cause hearing testimony at trial, and because the state suppressed, in violation of *Brady,* the Hightower statement, the Yellow Cab Company records, and the police report pertaining to Clark, the trial court should have found that no probable cause had existed.

"In order to decide the defendant's claim, we must examine the evidence presented at the preliminary hearing to determine whether it was sufficient to support the trial court's finding of probable cause." *State* v. *Mitchell,* 200 Conn. 323, 335, 512 A.2d 140 (1986). The standard for determining the existence of probable cause is " 'whether the government's evidence would warrant a person of reasonable caution to believe that the accused [had] committed the crime.' " Id., 336.

"The quantum of evidence necessary to establish probable cause at a preliminary hearing is less than the quantum necessary to establish proof beyond a reasonable doubt at trial . . . ." Id. Applying this standard, we conclude that the trial court did not err in finding that probable cause had been established.

At the probable cause hearing, the primary evidence implicating the defendant in both crimes was the testimony of Ronnie Walker and Michael Jiles. The defendant asserts that Ronnie Walker's trial testimony was so different from his probable cause hearing testimony that it amounted to a "recantation" of his probable cause hearing testimony. We do not agree. The main discrepancies between Ronnie Walker's probable cause hearing testimony and his trial testimony concern: (1) where he first encountered the defendant and Keith Johnson on the night of Leon Walker's murder; and (2) whether he actually saw the defendant pull the trigger in the Leon Walker murder. Regarding the first discrepancy, at the probable cause hearing Ronnie Walker stated that he first met the defendant and Johnson at Vicky White's house on Barbour Street in the north end of Hartford, that White called for Leon Walker's cab, and that the defendant and Johnson got into the cab outside of White's house. At trial, however, Ronnie Walker testified that he first encountered the defendant and Johnson upon departing from a party in the south end of Hartford, when he saw the defendant and Johnson already in Leon Walker's cab. Regarding the second inconsistency, at the probable cause hearing Ronnie Walker stated that he saw the defendant shoot Leon Walker.[10] At trial on cross-examination, however, he testified that he saw the defendant and

[10] Ronnie Walker testified at the probable cause hearing as follows:
"Q. Did you see where [the defendant] pointed the gun?
"A. At his head.
"Q. Front or rear?

Leon Walker disappear from sight, that he heard a gun shot, and that the defendant then returned to view.[11]

Aside from these two inconsistencies, Ronnie Walker's probable cause hearing testimony was essentially the same as his trial testimony. Similarly, Jiles' testimony concerning the defendant's admission to committing both crimes and, in particular, to pulling the trigger in both crimes, was essentially the same at the probable cause hearing and at trial. Therefore, in light of the standard set forth in *State* v. *Mitchell,* supra, we conclude that Ronnie Walker's testimony depicting the defendant as an active participant in both crimes, and Jiles' testimony regarding the defendant's admitting to killing both victims would have " 'warrant[ed] a person of reasonable caution to believe that the accused [had] committed the crime[s].' " Id.

The defendant also asserts that had the three items of evidence that he claims were suppressed in violation of *Brady* been disclosed at the probable cause hearing, the trial court would not have found that probable cause had existed. As this court noted in *State* v. *Mitchell,* supra, 338, the state's duty under *Brady* to disclose exculpatory evidence attaches to a probable cause hearing. As noted above, to prevail, the defendant must establish: " '(1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that it was material.' " *Demers* v. *State,* supra, 150, quoting *State* v. *Milner,* supra, 539–40. Further, such evidence will only be material if "there is

"A. The rear.

"Q. Can you pinpoint any closer than just the rear of the head? What part of the rear?

"A. Just the rear.

"Q. Okay. And then what happened?

"A. Then they started scuffling, threw him up against the fence.

"Q. Did he shoot him?

"A. Yes."

[11] See footnote 5, supra.

a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States* v. *Bagley,* supra, 682; *State* v. *Pollitt,* 205 Conn. 132, 142, 531 A.2d 125 (1987). We conclude that the nondisclosure of the three items of evidence at the probable cause hearing did not violate the *Brady* and *Mitchell* standards.

The state could not possibly have suppressed the Hightower statement during the probable cause hearing because, at the time of that hearing, the state was not aware of the Hightower statement. The probable cause hearing was held on January 21, 1986, and the state first learned of the Hightower statement on September 10, 1986. Further, the cab company records were not suppressed for the purposes of *Brady.* As we indicated above, the cab records were as available to the defense as to the state, and therefore were not suppressed. See *State* v. *Simms,* supra, 407–408.

In addition, the police report pertaining to Clark, a potential third party suspect in the Leon Walker murder, was not material under the *Bagley* standard and therefore does not constitute a *Brady* violation. When examined in light of all the evidence presented at the probable cause hearing, the police report would not have warranted " 'a person of reasonable caution to believe that the accused, [had not] committed the crime[s].' " *State* v. *Mitchell,* supra, 336. Thus, the result of the probable cause proceeding would not have been different as a result of the disclosure of the police report and, therefore, the state's failure to disclose the report is not material under *Bagley* and thereby not a violation of *Brady.*

## III

Finally, the defendant claims that the trial court's instructions unfairly emphasized the state's evidence

to such an extent that there was a reasonable possibility that the jury was misled. "We do not examine a challenged portion of a jury instruction in artificial isolation from the overall charge." *State* v. *Scognamiglio,* 202 Conn. 18, 27, 519 A.2d 607 (1987); see *State* v. *Reddick,* 197 Conn. 115, 132, 496 A.2d 466 (1985), cert. denied, 474 U.S. 1067, 106 S. Ct. 822, 88 L. Ed. 2d 795 (1986); *State* v. *Dolphin,* supra, 451. " 'Rather, we review the entire charge to determine if, taken as a whole, the charge adequately guided the jury to a correct verdict.' " *State* v. *Scognamiglio,* supra, 28; see *State* v. *Hines,* 187 Conn. 199, 206, 445 A.2d 314 (1982). "The trial court may, at its discretion, call the attention of the jury to the evidence, or lack of evidence, bearing upon any point in issue and may comment upon the weight of the evidence so long as it does not direct or advise the jury how to decide the matter." *State* v. *Mullings,* 166 Conn. 268, 274, 348 A.2d 645 (1974). We hold that the trial court's charge was fair and impartial. Considering the charge as a whole, we are persuaded that there was no reasonable possibility that the jury was misled in reaching its verdict. See *State* v. *Scognamiglio,* supra; *State* v. *Fleming,* 198 Conn. 255, 268–69, 502 A.2d 886, cert. denied, 475 U.S. 1143, 106 S. Ct. 1797, 90 L. Ed. 2d 342 (1986).

The defendant claims that portions of the trial court's jury instructions could have misled the jury. For example, the defendant claims that the trial court "critically reviewed" the testimony of Leon Harris while not mentioning "material inconsistencies" in the testimony of the state's witnesses. The defendant fails to describe specifically how the trial court "critically reviewed" Harris' testimony. Moreover, the trial court read a general instruction regarding the credibility of witnesses, and properly instructed the jury on prior inconsistent statements in connection with Ronnie Walker. See *State* v. *Taylor,* 196 Conn. 225, 232, 492 A.2d 155 (1985).

The defendant also argues that by mentioning testimony that indicated that the victims had not been sexually assaulted, the trial court effectively "directed a verdict" against him regarding his evidence implicating Alvin Clark as a third party suspect. We disagree. The trial court instructed the jury: "If you find that there is no sexual assault connotation to be drawn from the partially unclothed body of Mr. Walker or find no proof tending to connect Mr. Clark with the offense, you must not consider this theory of the case. On the other hand, if you do find such a motive and that there is evidence tending to connect Mr. Clark with Mr. Walker's death, then you must consider this theory with all the other evidence." We conclude that this instruction was proper and did not "direct a verdict" against the defendant on the issue of third party culpability.

Additionally, the defendant asserts that the trial court should have given a consciousness of guilt instruction based on evidence that Clark had run when first approached by the police. The defendant was not entitled to a consciousness of guilt instruction regarding Clark, however, as evidence demonstrating consciousness of guilt is only relevant where the act or statement is that of the *defendant*. See *State* v. *Milner,* supra, 519.

In conclusion, we are persuaded that, when examined in the context of the entire jury charge, the portions of the trial court's jury instructions that the defendant claims could have misled the jury, did not mislead the jury.

There is no error.

In this opinion HEALEY, CALLAHAN and SANTANIELLO, Js., concurred.

PETERS, C. J., dissenting. Although the question is admittedly a close one, in my judgment the trial court

abused its discretion in denying the defendant's motion for a new trial. My disagreement with the majority opinion is limited to the issue of the materiality of the Hightower statement, which the state concededly suppressed,[1] and which the trial court found to have contained impeachment evidence that the defendant could have used to his advantage at trial.

My point of departure is the state's duty to disclose this information, both as a matter of federal constitutional law, under the fifth and fourteenth amendments to the United States constitution, and as a matter of Connecticut statutory law, under General Statutes § 54-86c (a).[2] The state's failure to disclose adversely implicated the defendant's due process right to a fair trial.

I recognize that the defendant had the burden of proving the materiality of any favorable statements suppressed by the state, and that a determination of materiality is necessarily fact-bound, and thus rests initially in the trial court's discretion. *United States* v. *Bagley,* 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed.

---

[1] It makes no federal constitutional difference whether the state acted in good faith or in bad faith in suppressing this statement. *United States* v. *Agurs,* 427 U.S. 97, 104 n.10, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976); *Brady* v. *Maryland,* 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). This case has been briefed and argued solely on the basis of federal constitutional principles. The defendant has not, however, pursued the possibility that different principles might flow either from our state constitution or from our supervisory authority over the administration of justice in this state. See Practice Book § 4183.

[2] "[General Statutes] Sec. § 54-86c. DISCLOSURE OF EXCULPATORY INFORMATION OR MATERIAL. (a) Not later than thirty days after any defendant enters a plea of not guilty in a criminal case, the state's attorney, assistant state's attorney or deputy assistant state's attorney in charge of the case shall disclose any exculpatory information or material which he may have with respect to the defendant whether or not a request has been made therefor. If prior to or during the trial of the case, the prosecutorial official discovers additional information or material which is exculpatory, he shall promptly disclose the information or material to the defendant."

See also Practice Book §§ 741 (1), 755.

2d 481 (1985); *Brady* v. *Maryland,* 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *Demers* v. *State,* 209 Conn. 143, 150, 547 A.2d 28 (1988). The review of constitutionally significant factfinding requires, however, a heightened degree of appellate scrutiny, as we have held in a number of similar circumstances. We have, for example, conducted a scrupulous examination to review whether there is substantial support in the record as a whole for trial court rulings regarding the waiver of a defendant's *Miranda* rights,[3] a change of venue because of pretrial publicity,[4] and the setting aside of a verdict, which implicates a litigant's right to a jury trial.[5] Cf. *Brown* v. *K.N.D. Corporation,* 205 Conn. 8, 11–12, 529 A.2d 1292 (1987) (independent appellate examination of the whole trial record to review threat of intrusion into constitutionally protected free speech). "No more restricted scope of

---

[3] "Although the issue [of waiver of *Miranda* rights] is . . . ultimately factual, our usual deference to factfinding by the trial court is qualified, on questions of this nature, by the necessity for a scrupulous examination of the record to ascertain whether such a factual finding is supported by substantial evidence." *State* v. *Madera,* 210 Conn. 22, 48–49, 554 A.2d 263 (1989); *State* v. *Harris,* 188 Conn. 574, 580, 452 A.2d 634 (1982), cert. denied, 460 U.S. 1089, 103 S. Ct. 1785, 76 L. Ed. 2d 354 (1983); *State* v. *Frazier,* 185 Conn. 211, 219, 440 A.2d 916 (1981), cert. denied, 458 U.S. 1112, 102 S. Ct. 3496, 73 L. Ed. 2d 1375 (1982).

[4] "Although rulings on such motions are within the trial court's discretion . . . 'due to the grave constitutional implications attending such pretrial rulings, "appellate tribunals have the duty to make an independent evaluation of the circumstances." *Sheppard* v. *Maxwell,* 384 U.S. 333, 362–63, 86 S. Ct. 1507, 16 L. Ed. 2d 600 [1966].' " *State* v. *Marra,* 195 Conn. 421, 428, 489 A.2d 350 (1985); *State* v. *Vitale,* 190 Conn. 219, 227, 460 A.2d 961 (1983); *State* v. *Piskorski,* 177 Conn. 677, 685–86, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979).

[5] "Although the trial court has a broad legal discretion in this area it is not without limits; one immovable limitation is the constitutional right of trial by jury. . . . Because in setting aside a verdict the court has deprived a litigant in whose favor the verdict has been rendered of his constitutional right to have disputed issues of fact determined by a jury . . . the court's action cannot be reviewed in a vacuum. The evidential underpinnings of the verdict itself must be examined." *Jacobs* v. *Goodspeed,* 180 Conn. 415, 416–17, 429 A.2d 915 (1980).

review would suffice adequately to protect federal constitutional rights." *Culombe* v. *Connecticut,* 367 U.S. 568, 605, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961).

The defendant's principal argument about the materiality of the Hightower statement is that its availability would have assisted his cross-examination of Ronnie Walker, a crucial state witness. The state maintains, and the trial court found, that Walker was so thoroughly examined about his numerous inconsistent statements that one more damaging statement would have had no more than a cumulative effect. The majority concludes that this finding was warranted.

With deference, it seems to me that this conclusion fails to assign adequate weight to the significance of a statement that implicates Walker not only as a witness but also as the perpetrator of one of the crimes with which the defendant was charged. While the majority may be correct that the "jury was presented with a plethora of impeachment evidence pertaining to Ronnie Walker's credibility," none of the inconsistencies that came to light at trial was as probative as the Hightower statement would have been. First, knowing of Walker's statement to Hightower, the jury might have discredited any of his testimony incriminating the defendant on the theory that Walker was throwing up a smoke screen in order to shield himself from being brought to trial. Second, *this* prior inconsistent statement of Walker's, while admittedly one of many, would certainly have been the most damning to Walker's credibility as a witness. Even if the trial court would not have allowed the defendant to use the statement to prove that Walker had pulled the trigger, the defendant could have used it to show that he himself had not. None of Walker's prior inconsistent statements had said anything on this issue, having focused instead on whether he had actually viewed the killings. Finally, the fact that the defendant, at trial, vigorously pursued

the impeaching materials then at his disposal should not be held against him when much more probative material is belatedly disclosed.

On this record, even if the Hightower statement were inadmissible substantively,[6] I would conclude that the impeachment value of the statement might well have proved devastating to the state's case.[7] It bears repeating that, if Walker had been totally discredited, the state's case would have depended, almost exclusively, on the credibility of the testimony of two jailhouse informants against the defendant.

My conclusion concerning the materiality of the Hightower statement finds further support in the fact that, at trial, the defendant specifically requested from the state all memoranda and information that revealed inconsistencies in Walker's prior statements. "When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable." *United States* v. *Agurs,* 427 U.S. 97, 106, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). While the United States Supreme Court has held that the standard for materiality is the same for all favorable evidence, whether or not the defendant requested it, the court has also held that the *"Agurs* test for materiality [is] sufficiently flexible to cover the 'no request,' 'general request,' and 'specific request' cases of prosecutorial failure to disclose evidence favorable to the accused." *United States* v. *Bagley,* supra, 682. As the court noted in *Bagley,* "the more specifically the defense requests certain evidence . . . the more reasonable it is for the defense to assume from the non-

---

[6] It is not clear, on the present record, how the issue of the inadmissibility of this statement, on the various grounds alluded to in the majority opinion, would have been resolved at trial.

[7] As the majority recognizes, both substantive and impeachment evidence fall within the definition of "favorable evidence." *United States* v. *Bagley,* 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).

disclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption. . . . [T]he reviewing court may consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case. The reviewing court should assess the possibility that such effect might have occurred in light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a post-trial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor's incomplete response." Id., 682–83. Applying this flexible standard, I would conclude that there is a reasonable probability that the result of the proceeding would have been different if the Hightower statement had been disclosed to the defense at trial. Id., 682.

I also think that the majority too readily discounts the real evidence that the defendant might have been able to examine after a conversation with Hightower. It is worth noting that, on this issue, the trial court expressed no opinion, and therefore its denial of the new trial motion arguably deserves no special deference on this ground. On the merits, Hightower's failure to cooperate with the state, after his attempt at plea bargaining failed, does not prove that he would have been equally unresponsive to questioning by the defense. Had such a conversation elicited information from Hightower about the murder weapon or Walker's car, whatever evidence was brought to light would probably have been admissible at trial.[8] The defense should not be expected to produce hard data about possible leads that the state has precluded the defense from exploring. To dismiss the defendant's claims as speculative, a conclusion at least equally speculative, creates

---

[8] No physical evidence was introduced at the trial that led to the defendant's conviction.

a strong disincentive for state disclosure of exculpatory or impeachment evidence. Such a disincentive is inconsistent with the fair trial guarantee that underlies *Brady,* and inconsistent with the prosecutor's role as "the representative not of an ordinary party to a controversy, but of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done." Id., 675; *Berger* v. *United States,* 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935).

Accordingly, I respectfully dissent.