STATE OF CONNECTICUT *v.* CONCETTA RUSSELL
(10354)

NORCOTT, FOTI and LAVERY, Js.

Argued May 8—decision released September 8, 1992

*Linda P. Stamborsky,* with whom, on the brief, was *Patricia Buck Wolf,* for the appellant (defendant).

*Marjorie Allen Dauster,* deputy assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *Elpedio Vitale,* assistant state's attorney, for the appellee (state).

FOTI, J. After a trial by jury, the defendant was convicted of conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-59 (a) (1), attempt to commit assault in the first degree as an accessory in violation of General Statutes §§ 53a-8, 53a-49 (a) (2) and 53a-59 (a) (1), and criminal mischief in the first degree as an accessory in violation of General Statutes §§ 53a-8 and 53a-115 (a) (1). On appeal, the defendant claims that the trial court (1) improperly admitted hearsay statements of an alleged coconspirator, (2) improperly found that there was sufficient evidence to convict her of attempted assault in the first degree and (3) abused its discretion in allowing the state to ask leading questions of a witness. We affirm the judgment of the trial court.

The jury could reasonably have found the following facts. On the evening of August 10, 1989, the defendant was visiting her boyfriend, Dominic Torlish. As the defendant, Torlish and Gerard Edwards,[1] also known

---

[1] There is some confusion in the record and briefs as to Edwards' first name. The first three counts of the information, as well as the defendant's brief, refer to Edwards as "Gerard," while the state's brief and the transcript use "Gerald."

as G-Man, sat at the kitchen table in the Torlish residence, the defendant stated that she hated her sister, Carmel Staplins, and would get back at her for testifying against the defendant's husband at his recent trial on several felony charges. Immediately after the defendant's husband had been sentenced, the defendant had threatened Staplins, pointing a finger in her face and screaming, "You're dead." The defendant often expressed hatred for her sister.

Torlish previously had informed the defendant that Edwards claimed to be a hitman. As the three sat at the table that evening, Edwards displayed his gun to the defendant. Later, Torlish saw the defendant give Edwards several bills, one of which was a $20 bill, and heard the defendant say, "Here is this for taking care of what you got to take care of tonight." The defendant then told both Torlish and Edwards, "Be careful when you go to do this," and she gave Torlish directions to Staplins' house. Neither Torlish nor Edwards knew Staplins.

At 10:40 p.m., Torlish and Edwards left the house and drove a tan Datsun to Staplins' house. Edwards sat in the passenger seat and Torlish drove. At approximately 11 p.m., Torlish stopped the car in front of Staplins' house, and Edwards climbed through the passenger window, sat on the car door, and fired over the roof of the car at the house. Edwards emptied his gun, and nine shots hit the house near a large bow window. The lights were on inside the house at the time. Staplins had a habit of reading at night on the couch in front of the bow window, and the defendant was aware of this. At the time of the shooting, however, Staplins was in her bedroom, and her husband was in the basement. Neither was injured by the gunfire.

Staplins and other witnesses observed a light colored Datsun leaving the scene. While speeding away, Torlish

lost control of the car and hit a telephone pole. Tan colored paint chips were later recovered from the ground near the pole. A few days after the shooting, Torlish disposed of the damaged vehicle at a junkyard.

On August 11, 1989, when the defendant saw a news account of the shooting on television, she stated to Torlish, "I paid him good money and he didn't do a good job." She also told an acquaintance that the shooting had occurred because her sister deserved it. After the shooting, she told Torlish that they should keep their relationship a secret.

On August 14, 1989, Edwards was arrested on an outstanding warrant. When arrested, he had in his possession a gun later determined to have fired the casings and two of the bullets recovered at the scene of the shooting.

I

The defendant first claims that the trial court improperly admitted hearsay statements of her alleged co-conspirator, Torlish. The defendant argues that independent of these hearsay statements, the state did not present sufficient evidence to convict her for conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-59 (a) (1).

We will not review this claim, however, because of the defendant's failure to comply with Practice Book § 4065 (d) (3) for briefing claimed errors in evidentiary rulings.[2] "When raising evidentiary issues on appeal, all briefs should identify clearly what evidence was excluded or admitted, where the trial counsel objected

[2] Practice Book § 4065 (d) (3) provides in pertinent part: "When error is claimed in any other ruling in a court or jury case, the brief or appendix shall include, where appropriate . . . the question or offer of exhibit; the objection and the ground on which it was based; the ground on which the evidence was claimed to be admissible; the answer, if any; the ruling; and any exception."

and preserved his rights and why there was error." *Aspiazu* v. *Orgera*, 205 Conn. 623, 636–37 n.5, 535 A.2d 338 (1987); Practice Book § 4065 (d) (3). " 'The bare assertion in a brief that the evidence was improperly [admitted], coupled with transcript page references, will not suffice. . . . It is our strong policy that rulings claimed as evidentiary errors to be reviewed by this court be provided and printed in the briefs as required and outlined by the Practice Book.' (Citation omitted.)" *State* v. *Siller*, 12 Conn. App. 395, 402, 530 A.2d 1106, cert. denied, 205 Conn. 811, 532 A.2d 586 (1987).

In her brief, the defendant claims that the trial court improperly admitted Torlish's statements "as to Concetta Russell's plans with Gerard Edwards," and his statements "alleging that Concetta Russell engaged in acts that amounted to criminal conspiracy." She does not, however, set forth the specific testimony she claims was improperly admitted by the trial court. Therefore, we decline to review this claim.

## II

The defendant next claims that there was insufficient evidence to prove her guilty beyond a reasonable doubt of attempted assault in the first degree in violation of General Statutes §§ 53a-8, 53a-49 (a) (2) and 53a-59 (a) (1).

The standard for review of a challenge to the sufficiency of the evidence is well known. " 'We first review the evidence presented at trial, construing it in the light most favorable to sustaining the facts expressly found by the trial court or impliedly found by the jury. We then decide whether, upon the facts thus established and the inferences reasonably drawn therefrom, the trial court or the jury could reasonably have concluded that the cumulative effect of the evidence established the defendant's guilt beyond a reasonable doubt.' " *State* v. *Lewis*, 220 Conn. 602, 606, 600 A.2d 1330

(1991), quoting *State* v. *Jarrett,* 218 Conn. 766, 770–71, 591 A.2d 1225 (1991). The probative force of the evidence is not diminished because the evidence is circumstantial rather than direct. *State* v. *Marra,* 215 Conn. 716, 726, 579 A.2d 9 (1990).

The defendant was convicted of criminal attempt to commit assault in the first degree as an accessory in violation of §§ 53a-8, 53a-49 (a) (2) and 53a-59 (a) (1). " 'Under General Statutes § 53a-49 (a) (2), "[a] person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for the commission of the crime he . . . intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.". . .' " (Citations omitted.) *State* v. *Pinnock,* 220 Conn. 765, 774, 601 A.2d 521 (1992); *State* v. *Gonzalez,* 222 Conn. 718, 725, 609 A.2d 1003 (1992). The defendant argues that the state failed to prove that she had the requisite intent to commit assault and that her actions constituted a substantial step toward the commission of the crime of assault in the first degree. We disagree.

Our initial inquiry is whether the evidence was sufficient for the jury to conclude that the defendant had the intent to commit assault. In order to convict the defendant as an accessory to attempted assault, the state had to prove that the defendant solicited, requested, commanded, importuned or intentionally aided the principal to engage in conduct constituting an offense and that the defendant acted with the intent to commit the offense. General Statutes § 53a-8; *State* v. *Grant,* 219 Conn. 596, 603, 594 A.2d 459 (1991); *State* v. *Tucker,* 9 Conn. App. 161, 164, 517 A.2d 640 (1986). The crime of attempted assault requires proof of intent to cause serious physical injury. General Statutes § 53a-59 (a) (1). Intent can be inferred from the defend-

ant's verbal or physical conduct and the surrounding circumstances. *State* v. *Pinnock,* supra.

On the basis of the evidence presented at trial, the jury could reasonably have found that the defendant intended to cause serious physical injury to Staplins. After her husband's trial, the defendant threatened Staplins outside the courthouse saying "You're dead," and she repeatedly expressed hatred for her sister. Three days after her husband's sentencing, the defendant gave money to Edwards, who had shown her his gun and who she believed was a hitman. She told him, "This is for taking care of what you got to take care of tonight." She then gave Edwards and Torlish directions to her sister's house.

When Edwards and Torlish arrived at Staplins' house, Edwards fired nine shots at the large bow window in the front of the house. There were lights on in the living room at the time. The jury could reasonably have inferred that Edwards targeted the window because the defendant had apprised him of Staplins' habit of reading at night on the couch in front of the bow window. Furthermore, after the shooting, upon hearing news accounts of the event, the defendant complained that she had paid good money for a job that was not well done.

We next determine whether the evidence was sufficient to establish, as required by § 53a-49 (a) (2), that the defendant's actions constituted a substantial step in a course of conduct planned to culminate in her commission of the crime of assault in the first degree.

"To constitute a 'substantial step,' the conduct must be 'strongly corroborative of the actor's criminal purpose.' . . . [T]his standard properly directs attention to overt acts of the defendant which convincingly demonstrate a firm purpose to commit a crime." (Citation omitted.) *State* v. *Green,* 194 Conn. 258, 276–77, 480

A.2d 526 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 964, 83 L. Ed. 2d 969 (1985); *State* v. *Taft,* 25 Conn. App. 578, 582–83, 595 A.2d 918, cert. denied, 220 Conn. 921, 597 A.2d 343 (1991). The act or acts must constitute more than mere preparation but at least must be " 'the start of a line of conduct which will lead naturally to the commission of a crime which appears to the [defendant] at least to be possible of commission by the means adopted.' " *State* v. *Green,* supra, 276; *State* v. *Rochette,* 25 Conn. App. 298, 305, 594 A.2d 1006, cert. denied, 220 Conn. 912, 597 A.2d 337 (1991).

The jury could reasonably have inferred that in giving money to a man who had a gun and whom she believed to be a hitman, along with providing directions to Staplins' house and information that led Edwards to target the bow window, the defendant took actions constituting a substantial step in a course of conduct planned to culminate in her commission of the crime of assault in the first degree as an accessory.

### III

Finally, the defendant claims that the trial court abused its discretion in allowing the state to ask leading questions during its direct examination of Torlish.[3]

---

[3] On direct examination of Torlish, the state inquired:

"[The State]: So your mother and evidently this defendant became friendly?

"[The Witness]: Yes, sir.

"[Defense Counsel]: I object. Counsel is leading.

"[The Court]: It is leading. I will allow that to stand as a yes answer. Go ahead, counsel. . . .

"[The State]: Sir, at the weeks preceding August, 1989, say from July to August of 1989, can you describe what your relationship was like with this defendant in terms of money matters or decisions, those types of things?

"[The Witness]: I don't understand.

"[The State]: Whenever there was a decision that had to be made between yourself and the defendant Concetta Russell—

"[Defense Counsel]: Your Honor, I object. Counsel is leading the witness.

"[The Court]: We haven't heard the question yet, counsel. I will let the state's attorney finish the question. But I will ask, sir, don't answer it until

The defendant argues that she was prejudiced because Torlish's testimony characterized the defendant as a controlling and dominating figure in their relationship, thereby leading the jury to believe that the defendant was the motivational force behind the shooting.

"A question is leading if it suggests an answer in accord with the examiner's view of the matter rather than calling for an expression of the witness's observations . . . ." C. Tait & J. LaPlante, Connecticut Evidence (2d Ed.) § 7.12.1, p. 159. "It is axiomatic that trial courts have broad discretion to allow leading questions on direct examination depending upon the circumstances of the individual case. *Wright* v. *Blakeslee,* 102 Conn. 162, 168, 128 A. 113 (1925)." *Fonsworth* v. *Sudol,* 19 Conn. App. 368, 370, 562 A.2d 578, cert. denied, 212 Conn. 819, 565 A.2d 537 (1989). The trial court's

I had an opportunity to rule on any objection. Okay. Finish your question, counsel.

"[The State]: Assume for a moment, sir, that there had—there was a decision that had to be made involving your relationship, yourself and the defendant Concetta Russell, okay, whether it be about money or some other important decision, okay. Can you please describe as best you can to the jury how that decision making process would operate, if you could. If you understand my question.

"[The Court]: Is there any objection, counsel?

"[Defense Counsel]: I find it to be a leading question. I object to it.

"[The Court]: Thank you. Objection is overruled. I will note an exception. You can answer the question if you understand it, sir.

"[The Witness]: I don't understand.

"[The State]: If a decision had to be made about, say, a money matter or something involving another major decision, okay, how would that decision be made if you and the defendant were talking about it?

"[The Witness]: Connie would make the decision."

In her brief, the defendant claims that she was prejudiced by the trial court's rulings on the aforementioned questions. She claims that "[A]fter those objections were overruled . . . defense attorney realize[d] that further objections as to leading the witness would be futile, and therefore did not raise that objection with this witness again." Because the defendant failed to object on this ground to any other questions and because, in her brief, she has failed to identify other questions specifically as improper, we will review her claim with respect to only those two questions. See Practice Book § 4065 (d) (3).

rulings on leading questions must stand unless prejudice has resulted from their admission. *Wright* v. *Blakeslee,* supra; *Melanson* v. *Rogers,* 38 Conn. Sup. 484, 488, 451 A.2d 825 (1982).

Although the question regarding the defendant and Torlish's mother was a leading question, the trial court did not abuse its discretion in allowing the witness to answer. The defendant was not prejudiced because the question was a preliminary inquiry into how the defendant had become acquainted with Torlish and his family. See *State* v. *Costelli,* 92 Conn. 58, 65–66, 101 A. 476 (1917). The second question posed by the state was not leading because it did not suggest an answer to the witness, but, rather, called for Torlish to characterize the balance of power in his relationship with the defendant. Furthermore, the defendant was not prejudiced by the trial court's ruling. A review of the transcript demonstrates that the state presented other evidence regarding the defendant's controlling nature in her relationship with Torlish, the defendant's motive to cause harm to Staplins, and her involvement in the crime. From the totality of the evidence, the jury could reasonably have concluded that Torlish and Edwards perpetrated the crime at the defendant's behest.

The judgment is affirmed.

In this opinion the other judges concurred.