STATE OF CONNECTICUT *v.* EDWARD R. SHERMAN
(13649)

DUPONT, C. J., and LANDAU and SPEAR, Js.

Argued October 25, 1994—decision released July 11, 1995

*James A. Wade,* with whom were *Daniel F. Sullivan* and, on the brief, *John W. Steinmetz,* for the appellant (defendant).

*C. Robert Satti, Sr.,* state's attorney, with whom were *Sarah E. Steere* and, on the brief, *Holly Cini,* certified legal intern, for the appellee (state).

LANDAU, J. The defendant appeals[1] from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a.[2] He claims that prosecutorial misconduct deprived him of his constitutional right to a fair trial. The defendant also claims that the trial court improperly (1) admitted into evidence expert opinion testimony regarding the time of death that was based on unestablished factual assumptions and unreliable methodology, (2) excluded from evidence the defendant's expert's opinion as to time of death because of an alleged sequestration order violation, (3) admitted evidence of the victim's subjective state of mind, and (4) denied the defendant's motions for judgment of acquittal and a new trial.

The jury reasonably could have found the following facts. The victim, Ellen Sherman, was the defendant's wife. Due in part to extramarital affairs on the part of both the defendant and the victim, their marriage was contentious. On Friday, August 2, 1985, the defendant and the victim both arrived home after work at about 4 p.m. Several hours later, the defendant left the house for a week long sailing trip with four friends. On Sunday, August 4, the defendant made a ship to shore call to Barbara LeValley, a friend of the victim's,

---

[1] Pursuant to Practice Book § 4023, our Supreme Court transferred the defendant's appeal to this court. Practice Book § 4023 provides in pertinent part: "Except for any matter brought pursuant to its original jurisdiction under the constitution, the supreme court may transfer a cause or class of causes from itself to the appellate court. The court to which a cause is transferred has jurisdiction. . . ."

[2] General Statutes § 53a-54a (a) provides in pertinent part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

and asked her to check on the victim, as he had been unsuccessful in his efforts to contact her for two days. LeValley sent another friend, Len Fredriksen, to the Sherman residence. When Fredriksen arrived and found the house locked, he pried open a window and entered. Fredriksen discovered the naked body of the victim, then five and one-half months pregnant, in the master bedroom. The victim had died as a result of strangulation, both manual and ligature. When the body was discovered, the air conditioner in the bedroom was on and the door was closed, causing the room to be noticeably cold.

The defendant was not arrested for the murder of his wife until March, 1990. Initially, Catherine Galvin, then chief medical examiner for the state of Connecticut, determined that the victim had died between twenty-four and thirty-six hours prior to her observation of the body. The defendant had left on his trip over sixty hours prior to Galvin's observation. After being informed that the temperature of the bedroom when the body was found was "very cold, like a refrigerator," Galvin reevaluated the time of death and determined that the victim had died between forty-eight and ninety-six hours prior to observation.

A probable cause hearing lasting fourteen days preceded a jury trial, at the conclusion of which the jury returned a verdict of guilty. The trial court subsequently denied the defendant's motions for judgment of acquittal and for a new trial. This appeal followed.

## I

### PROSECUTORIAL MISCONDUCT

The defendant first claims that the misconduct of the state's attorney throughout the probable cause hearing and trial deprived him of a fair trial in violation of the due process clause of the fourteenth amendment

to the United States constitution and article first, § 8, of the Connecticut constitution.[3] He alleges that the prosecutor's misconduct falls into seven categories of proscribed behavior, each of which was sufficient to deny him a fair trial: (1) suppression of evidence favorable to him in violation of *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); (2) deliberate disregard of the trial court's ruling on a motion in limine and improper questioning; (3) withholding of witnesses' statements; (4) commenting on facts not in evidence; (5) expressions of opinion as to the defendant's credibility and guilt; (6) injection of extraneous matter into the trial and appeal to the jurors' emotions; and (7) misrepresentation that the state would call a certain witness. The defendant also seeks review of the cumulative effect of this claimed misconduct, asserting that the various instances can be viewed as "individual strands in a web of prosecutorial impropriety that blanketed the entire trial"; *State* v. *Castonguay*, 218 Conn. 486, 509, 590 A.2d 901 (1991); and violated his right to a fair trial.

"In analyzing the defendant's claim, we ask whether the prosecutor's conduct ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' *Darden* v. *Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986), quoting *Donnelly* v. *DeChristoforo*, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974); *State* v. *Hawthorne*, 176 Conn. 367, 372, 407 A.2d 1001 (1978). We do not focus alone, however, on the conduct of the prosecutor. ' "The fair-

---

[3] "Due process claims under the federal and state constitutions can be treated together because they impose similar constitutional limitations. *Keogh* v. *Bridgeport*, 187 Conn. 53, 59–60, 444 A.2d 225 (1982). The defendant offers no argument for separate treatment of his state constitutional claim. Accordingly, we will consider only his federal constitutional claim. *State* v. *Mercer*, 208 Conn. 52, 67 n.9, 544 A.2d 611 (1988)." *State* v. *Flanders*, 214 Conn. 493, 500 n.4, 572 A.2d 983, cert. denied, 498 U.S. 901, 111 S. Ct. 260, 112 L. Ed. 2d 217 (1990).

ness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct." ' *State* v. *Palmer*, 196 Conn. 157, 163, 491 A.2d 1075 (1985), quoting *State* v. *Ubaldi*, 190 Conn. 559, 562, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983); see also *Darden* v. *Wainwright*, supra [181]; *State* v. *Doehrer*, 200 Conn. 642, 654, 513 A.2d 58 (1986).

"In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the misconduct was invited by defense conduct or argument; *State* v. *Fullwood*, [194 Conn. 573, 585, 484 A.2d 435 (1984)]; *State* v. *Falcone*, 191 Conn. 12, 23, 463 A.2d 558 (1983); the severity of the misconduct; see *United States* v. *Modica*, 663 F.2d 1173, 1181 (2d Cir. 1981); the frequency of the misconduct; *State* v. *Couture*, [194 Conn. 530, 562–63, 482 A.2d 300 (1984)]; see *State* v. *Doehrer*, supra, [200 Conn.] 654; *State* v. *Palmer*, supra, [196 Conn.] 163; the centrality of the misconduct to the critical issues in the case; *Hawthorne* v. *United States*, 476 A.2d 164, 172 (D.C. App. 1984); the strength of the curative measures adopted; *United States* v. *Modica*, supra [1181]; *Harris* v. *United States*, 402 F.2d 656, 657 n.1 (D.C. Cir. 1968); *State* v. *Doehrer*, supra [654]; and the strength of the state's case. See *United States* v. *Modica*, supra [1181]; *State* v. *Couture*, supra, 564; *State* v. *Glenn*, [194 Conn. 483, 492, 48 A.2d 741 (1984)]." *State* v. *Williams*, 204 Conn. 523, 539–40, 529 A.2d 653 (1987).

A

The defendant first argues that the state suppressed ten distinct sets of evidence that were favorable to him in violation of *Brady* v. *Maryland*, supra, 373 U.S. 83.

In particular, he asserts that, at the probable cause hearing, the state withheld (1) a statement made by Fredriksen wherein he admitted to having had an affair with the victim, (2) a statement made by Fredriksen to the police on August 4, 1985, (3) a police report of an interview with Carol Colangeli on August 5, 1985, (4) LeValley's date book, (5) Detective Michael Malchik's report regarding the condition of the locks at the defendant's residence, (6) a copy of the bill from the Shermans' dinner at the Inn at Chester on August 1, 1985, (7) a police report of an interview with trial witness Theodore Mathieu, (8) the autopsy of the fetus, (9) the state police major crime squad checklist on which was recorded the temperature taken at the crime scene on August 5, 1985, and (10) the police report of an interview with LeValley on August 4, 1985.

It has long been held, "on the basis of *Brady* v. *Maryland*, [supra, 373 U.S. 83], and its progeny, that [s]ince the adversarial probable cause hearing [mandated by article first, § 8, of the Connecticut constitution as amended] . . . is an essential part of a defendant's criminal prosecution, the constitutional obligation to disclose exculpatory material attaches at that time. . . . [I]n *State* v. *Shannon*, 212 Conn. 387, 406, 563 A.2d 646 [cert. denied, 493 U.S. 980, 110 S. Ct. 510, 107 L. Ed. 2d 512] (1989), [the Supreme Court] held that in order for this court to consider claims of nondisclosure of exculpatory material at a probable cause hearing required by our state constitution, the defendant must demonstrate: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that it was material. *State* v. *Milner*, 206 Conn. 512, 539, 539 A.2d 80 (1988)." (Internal quotation marks omitted.) *State* v. *White*, 229 Conn. 125, 134–35, 640 A.2d 572 (1994), quoting *State* v. *McPhail*, 213 Conn. 161, 166–67, 567 A.2d 812 (1989).

If, after applying that analysis, we conclude that the state did suppress evidence in violation of *Brady* at the probable cause hearing, it is then incumbent upon us to determine whether " 'the nondisclosure did in fact taint the defendant's subsequent prosecution' and 'deprived the defendant of his constitutional right to a fair trial.' " *State* v. *White*, supra, 229 Conn. 138. "[W]here there has been an initial disclosure of exculpatory evidence at trial, the appropriate standard to be applied is whether the disclosure came so late as to prevent the defendant from receiving a fair trial. . . . *State* v. *Walker*, 214 Conn. 122, 127, 571 A.2d 686 (1990). In other words, exculpatory evidence must be disclosed at a time in which it can be [effectively] used. *State* v. *Pollitt*, 199 Conn. 399, 414, 508 A.2d 1 (1986). When exculpatory evidence is not timely disclosed its potential importance to the defense must be evaluated in light of the strength or weakness of the evidence presented against the defendant. *State* v. *Amarillo*, 198 Conn. 285, 298, 503 A.2d 146 (1986); *State* v. *Green*, supra, 194 Conn. 264." (Internal quotation marks omitted.) *State* v. *White*, supra, 138.

With respect to eight of the defendant's ten claims of suppressed evidence, we need not analyze whether the state violated *Brady* at the probable cause hearing. Even if we assume, arguendo, that the state did improperly suppress these eight sets of evidence, we nonetheless conclude that the nondisclosure at the probable cause hearing did not taint the defendant's subsequent prosecution and deprive him of his constitutional right to a fair trial.

The statement made by Fredriksen to the police on August 4, 1985, was disclosed to the defendant during the trial. Moreover, it was disclosed at a time when it could be effectively used. See *State* v. *Pollitt*, supra, 199 Conn. 414. The defendant offered the statement as a defendant's exhibit and used it during his cross-

examination of Fredriksen. Similarly, the defendant offered the relevant pages from LeValley's date book as a defendant's exhibit and cross-examined LeValley at the trial with respect to those pages. The defendant also offered the copy of the bill from his dinner at the Inn at Chester, which was disclosed during the trial in time for its effective use. Malchik's report on the condition of the locks, the police report of the interview with Mathieu, the major crime squad checklist, and the police report of the interview with LeValley were each disclosed by the state before the trial. Finally, while the autopsy of the fetus was initially disclosed during the trial, the defendant had used it during his cross-examination of the physician who performed the autopsy.

The defendant also alleges that the state failed to disclose a statement made by Fredriksen in which he admitted to having had an affair with the victim. Asserting that the state's case at the probable cause hearing relied in great part on the testimony of Fredriksen, the defendant contends that the suppressed evidence would have impeached Fredriksen's credibility. The state responds that this evidence was not suppressed in that it was known to the defendant.

"[E]vidence known to the defendant or his counsel, or that is disclosed, even if during [the probable cause hearing], is not considered suppressed as that term is used in *Brady*. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Rasmussen*, 225 Conn. 55, 91, 621 A.2d 728 (1993). In this case, the defendant had personal knowledge prior to the probable cause hearing that Fredriksen had had an affair with the victim. He acknowledged the fact in his polygraph interview on August 5, 1985, and questioned Fredriksen about the affair on cross-examination during the probable cause proceedings. We conclude, therefore, that Fredriksen's statement was not suppressed.

The defendant's last claim of suppressed evidence relates to the police report of an interview with Colangeli. During the interview, she stated that Fredriksen had told her on August 5, 1985, that he believed that the marital differences between the defendant and the victim "had been patched up." The defendant claims that this evidence could have been used to impeach Fredriksen, who testified both at the probable cause hearing and at trial that not long before her death, the victim had discussed with him the possibility of divorcing the defendant. The state disclosed the report on December 18, 1991, after Fredriksen had testified at the trial. Consequently, the defendant argued before the trial court, as he does now, that he was unable to make effective use of the report as impeachment material at either the probable cause hearing or the trial. The trial court denied the defendant's motion to dismiss on this basis.

The report was not disclosed until the trial and it was therefore suppressed at the probable cause hearing, as per the first prong of the three part test set forth in *State* v. *Shannon*, supra, 212 Conn. 387. As to the second prong of the test, which requires that the evidence must be favorable to the defense, it is well established that "[i]mpeachment evidence as well as exculpatory evidence falls within *Brady*'s definition of evidence favorable to an accused." *State* v. *Pollitt*, 205 Conn. 132, 142, 531 A.2d 125 (1987); *United States* v. *Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). We must then consider whether the suppressed report was material in order to determine whether its nondisclosure at the probable cause hearing constituted a *Brady* violation.

Materiality is to be evaluated "by utilizing the test set forth in *United States* v. *Bagley*, [supra, 473 U.S. 682]. *State* v. *Shannon*, supra, [212 Conn.] 406–407. Under the *Bagley* test, nondisclosed exculpatory evidence will be

considered material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *United States* v. *Bagley*, supra, 682." (Internal quotation marks omitted.) *State* v. *White*, supra, 229 Conn. 135.

"In analyzing a *Brady* claim, the courts 'must avoid concentrating on the suppressed evidence in isolation. Rather, we must place it in the context of the entire record. Evidence that may first appear to be quite compelling when considered alone can lose its potency when weighed and measured with all the other evidence, both inculpatory and exculpatory. Implicit in the standard of materiality is the notion that the significance of any particular bit of evidence can only be determined by comparison to the rest.' *Trujillo* v. *Sullivan*, 815 F.2d 597, 613 (10th Cir.), cert. denied, 484 U.S. 929, 108 S. Ct. 296, 98 L. Ed. 2d 256 (1987); see *State* v. *Pollitt*, supra, [205 Conn.] 143. Further, '[t]he determination of materiality has been said to be "inevitably factbound" and like other factual issues is committed to the trial court in the first instance.' *State* v. *Pollitt*, supra, 147. 'There is a difficulty inherent in measuring the effect of nondisclosure in the course of a lengthy trial with many witnesses and exhibits . . . this lack of certitude suggests deference by a reviewing court especially in the weighing of evidence.' Id., 149; see *United States* v. *Kelly*, 790 F.2d 130, 136 (D.C. Cir. 1986); *United States* v. *Pflaumer*, 774 F.2d 1224, 1230 (3d Cir. 1985), cert. denied, 475 U.S. 1046, 106 S. Ct. 1263, 89 L. Ed. 2d 572 (1986). Thus, the trial court's decision regarding the defendant's petition for a new trial as a result of a *Brady* violation will be overturned only upon a finding of 'clear abuse of discretion.' *Demers* v. *State*, [209 Conn. 143, 148, 547 A.2d 28 (1988); *Wetzel* v. *Thorne*, 202 Conn. 561, 564–65, 522 A.2d 288 (1987); *Asherman*

v. *State*, 202 Conn. 429, 434, 521 A.2d 578 (1987)."
*State* v. *Shannon*, supra, 212 Conn. 399–400.

We cannot conclude that, had the defendant had access to the report during the probable cause hearing, there is a reasonable probability that the result of the proceeding would have been different. The defendant extensively cross-examined Fredriksen on matters including the fact that Fredriksen had had sexual relations with the victim and that Fredriksen believed that the defendant had killed the victim. We conclude that, in the context of a probable cause hearing that lasted fourteen days, the nondisclosure of the challenged evidence was immaterial.

Because the same standard of materiality applies to the analysis of an alleged *Brady* violation at trial, we also conclude that the trial court did not abuse its discretion in denying the defendant's motion to dismiss.

## B

In support of his prosecutorial misconduct claim, the defendant next argues that the state deliberately disregarded the trial court's ruling on a motion in limine and posed improper questions to witnesses. The trial court granted the defense's motion to limit the cross-examination of the defendant in certain areas not raised on direct examination.[4] The defendant now asserts that the state deliberately violated the motion in limine when it cross-examined him as to (1) whether he had ever previously assaulted anyone, (2) his refusal to let the state police test the air conditioner, and (3) a discus-

---

[4] In his motion in limine, the defendant moved to preclude cross-examination regarding "1. Test procedures, questions and results of the polygraph examination administered to the defendant on August 5, 1985; 2. Alleged acts of 'interference' with the investigation; 3. Alleged acts of other misconduct of the defendant relating to a 1974 incident involving Patricia Bailey and a 1988 incident involving Nancy Prescott."

sion with Roger Peterson that constituted an alleged act of interference with the investigation.[5]

As previously discussed, in considering claims of prosecutorial misconduct, we apply a due process analysis and consider whether the defendant was deprived of a fair trial. See *State* v. *Williams,* supra, 204 Conn. 539–40. A different standard is applied, however, when the claim involves "deliberate prosecutorial misconduct during trial which violates express trial court rulings . . . ." *State* v. *Ubaldi,* supra, 190 Conn. 570. In such instances, "[t]his court . . . has supervisory power to vacate a judgment of conviction and to order a new trial to deter prosecutorial misconduct which, while not so egregious as to deprive the defendant of a fair trial, is unduly offensive to the maintenance of a sound judicial process." (Internal quotation marks omitted.) *State* v. *Fullwood,* 194 Conn. 573, 584, 484 A.2d 435 (1984). In determining whether the use of our supervisory powers to reverse a conviction is appropriate, we consider whether the effect of the challenged remark "was to undermine the authority of the trial court's ruling . . . ." *State* v. *Ubaldi,* supra, 574. We also consider the degree of prejudice suffered by the defendant as a result of the remark. *State* v. *Ruiz,* 202 Conn. 316, 330, 521 A.2d 1025 (1987); *State* v. *Ubaldi,* supra, 573.

Our Supreme Court, however, has urged a cautionary approach in this regard, noting that "[r]eversal of

---

[5] The defendant also contends that, during the nine and one-half day cross-examination of him, the state asked improper questions, including (1) questions relating to attorney-client communications, (2) whether he had forced the victim to have an abortion, (3) whether he was willing to sign authorizations to allow the state to obtain the records of his marriage counselor, (4) a question suggesting that he had fabricated a previous answer, (5) numerous, repetitive and irrelevant questions, and (6) questions relating to an improperly undisclosed newsletter. Beyond his assertion that these questions were improper, the defendant has provided us with no analysis or legal authority to support this claim. Because the issue is inadequately briefed, it is deemed abandoned and we decline to review it. *State* v. *Yopp,* 35 Conn. App. 740, 750, 646 A.2d 298 (1994).

a conviction under our supervisory powers . . . should not be undertaken without balancing all of the interests involved: the extent of prejudice to the defendant; the emotional trauma to the victims or others likely to result from reliving their experiences at a new trial; the practical problems of memory loss and unavailability of witnesses after much time has elapsed; and the availability of other sanctions for such misconduct." *State* v. *Ruiz*, supra, 202 Conn. 330; see also *State* v. *Ubaldi*, supra, 190 Conn. 572.

The defendant first asserts that the prosecutor deliberately violated the motion in limine when he inquired as to whether the defendant had ever assaulted anyone. Specifically, the defendant challenges the following questions, which were posed to him in the presence of the jury: "[I]sn't it a fact that you have on occasions hurt people?" and "You have previously assaulted—prior to the time you spoke to Mr. Malchik, you assaulted people, hadn't you?" The defendant objected to both questions. While the state withdrew the first question, argument was held in the absence of the jury regarding the propriety of the second question.

In sustaining the defendant's objection, the trial court ruled that "the court does not find that the general question of whether or not the defendant had previously assaulted people is any less or is any more acceptable than the specific question of whether he assaulted a particular person on a particular day . . . ."[6] The court admonished the state to advise the court in

---

[6] In argument on the motion in limine, the state had asserted that it should be permitted to cross-examine the defendant as to two specific assaults that he had allegedly committed, one in 1974 and one in 1988. The state argued that this evidence went to consciousness of guilt, in that the defendant had told the police that he was not a violent person. In ruling on the motion in limine, the court precluded inquiry into these two incidents, finding that their prejudicial effect outweighed their probative value.

advance and out of the presence of the jury if it intended to bring up the specific incidents precluded by the motion in limine or any other alleged assaults by the defendant. The court also instructed the jury to disregard the question and "not to speculate about what the answer might have been."

We cannot say that the state's questions were so unduly offensive to the maintenance of a sound judicial process that reversal of the defendant's conviction is necessary. The trial court itself found that the state's questions did not directly undermine the court's ruling. While the court did sustain the defendant's objection to the questions, it did so on the theory that the questions were similar to those meant to be precluded by the motion in limine. Further, any prejudice the defendant may have suffered was remedied by the court's curative instruction to the jury. "The defendant made no claim at trial, nor has he claimed on appeal, that the curative instruction given to the jury was in any way defective. We have often held that a prompt cautionary instruction to the jury regarding improper prosecutorial remarks obviates any possible harm to the defendant. See *State* v. *Nowakowski*, 188 Conn. 620, 624, 452 A.2d 938 (1982); *State* v. *Piskorski*, [177 Conn. 677, 720–21, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979)]; *State* v. *Hawthorne*, [176 Conn. 367, 373, 407 A.2d 1001 (1978)]." *State* v. *Ubaldi*, supra, 190 Conn. 563.

The defendant next argues that the state improperly began to ask about the defendant's alleged refusal to allow the state police to test the air conditioner.[7] Dur-

[7] During the argument on the motion in limine, the trial court requested that the defendant elaborate on what he intended to include within the parameters of his motion in limine. Regarding the "alleged acts of 'interference' with the investigation," the defendant specified that cross-examination should be precluded as to his alleged refusal to permit the state police to conduct tests inside the house.

ing cross-examination of the defendant, the state asked: "[B]etween August of 1985 and September of 1986, the air conditioner was available to be tested in that room; isn't that correct?" The defendant objected, claiming that the question was argumentative and that "there's another legal basis for it." The court agreed that the question was argumentative and sustained the objection.

The state then asked: "Do you know anything about the state police seeking permission in September of 1985 . . . ." The defendant interrupted with an objection and the state withdrew the question. After the jury had been excused, the defendant moved for a mistrial, claiming that the state, by beginning to pose a prohibited question, had again deliberately disregarded the motion in limine. The court denied the motion.

Through his motion in limine, the defendant sought to prevent the state from asking whether he had refused to let the state police test the air conditioner. The inference that he sought to avoid was consciousness of guilt. Our review of the record reveals that the actual questions asked, considered in context, did not expose the jury to the supposition that the defendant had interfered with the testing of the air conditioner. Consequently, the jury could not have drawn the unfavorable inference. There is merit to the defendant's contention that he should not have been forced to object to a line of questioning seemingly headed toward matter barred by the motion in limine. The minimal prejudice that the defendant may have suffered, however, plainly renders the sanction of reversal inappropriate in this instance.

Finally, the defendant asserts that the state disregarded the court's ruling on the motion in limine when it asked about a discussion with Roger Peterson that constituted an alleged act of interference with the

investigation. Additional facts are necessary to put this claim in perspective. After Peterson had testified before the grand jury in November, 1987, he and the defendant had a discussion, during which Peterson got the impression that the defendant was attempting to change his recollection of the events of August 2, 1985. Peterson contacted Detective Malchik and gave a statement on December 12, 1987, in which he recounted the discussion. In the statement, Peterson related that the defendant had said to him, "You got emotional about [the victim] not coming out [of the house on August 2, 1985]" and that Peterson had responded, "I was emphatic that she would have come out."

During its case-in-chief, the state introduced Peterson's statement as consciousness of guilt evidence. In its ruling on the motion in limine, however, the court barred cross-examination of the defendant as to Peterson's statement because the defendant had not testified on direct examination about his discussion with Peterson. The defendant now challenges the fact that the state asked the defendant, "Did you at some time tell Roger that he got emotional about [the victim's] not coming out?"[8] The defendant immediately objected to the question and subsequently moved for a mistrial. The trial court again denied his motion.

The court precluded cross-examination about Peterson's statement because it was outside the scope of the defendant's direct testimony, not because it could implicate the defendant's consciousness of guilt. In fact, the

---

[8] The defendant also seems to challenge the state's question, "Sometime after August 2, 1985, did Roger tell you that there was never a time when he'd come to the house, to the house, not necessarily inside, that [the victim] wouldn't, in some fashion, greet him?" This question, however, which was withdrawn upon objection by the defendant, does not go to the precluded subject matter of the defendant's alleged attempt to sway Peterson's recollection of events. Consequently, the defendant's argument that this question was in deliberate disregard of the court's ruling misses its mark.

statement had been admitted into evidence on the basis of a consciousness of guilt theory. Consequently, in violating the motion in limine in this instance, the state was delving into subject matter outside the scope of direct examination, not subject matter that the court had ruled unduly prejudicial or inadmissible on a specific evidentiary basis. While the state was wrong to broach the topic of Peterson's statement, it never directly asked the defendant a question implying that he had attempted to change Peterson's recollection of events. For these reasons, we must conclude again that, while the defendant should not have been forced to object to halt a line of questioning that seemed headed toward precluded subject matter, the actual prejudice, if any, that he suffered cannot support a resort to our supervisory powers.

## C

The defendant next argues, in support of his prosecutorial misconduct claim, that the state improperly withheld witness statements. Specifically, he contends that it was not until his cross-examination of both LeValley and Malchik that it became apparent that the state had failed to produce relevant statements of these witnesses despite his timely request for production pursuant to Practice Book § 752[9] and, at least with respect to LeValley's statement, the state's representation that it had turned over all relevant material.

In response to questioning by the defendant on cross-examination, LeValley explained that she had given the state a date book containing information concerning events about which she had testified. The state offered

---

[9] Practice Book § 752 provides: "After a witness called by the state has testified on direct examination at trial, the judicial authority shall, on motion of the defendant, order the state to produce any statement of the witness in the possession of the state or its agents, including state and local law enforcement officers, which statement relates to the subject matter about which the witness has testified."

to give her the date book to refresh her recollection as to a certain question posed by the defendant. When defense counsel made a claim to see the date book, the trial court excused the jury. After reviewing the date book and hearing argument, the court ordered that the two pages covering July 29, 1985, to August 3, 1985, be reproduced and made available to the defendant. On one of those pages, under the date August 2, 1985, was the statement at issue here, a handwritten notation stating "call Ell around 11."

Relying on Practice Book § 755,[10] the defendant subsequently made a motion to strike LeValley's direct testimony and, in the alternative, a motion for mistrial based on the state's failure to turn over the statement contained in the date book prior to the start of his cross-examination. The trial court ruled that it had never ordered the state to produce statements made by LeValley. Rather, the court found that all discovery as to such statements had been made by agreement of the state. Therefore, the trial court concluded, the state's failure to honor its agreement did not constitute an "elect[ion] not to comply with an order of the judicial authority." See Practice Book § 755. For this reason, the court found it unnecessary to strike LeValley's testimony or to grant a mistrial. See id. The court also specifically found that the state's failure to disclose the statement before the defendant's cross-examination was not done in bad faith and was harmless to the defendant. The court stated that "the failure to produce [the statement] at the appropriate time, that is, when the state finished their examination, was in fact

---

[10] Practice Book § 755 provides: "If the prosecuting authority elects not to comply with an order of the judicial authority to deliver to the defendant any statement of a witness who has testified or such portion thereof as the judicial authority may direct, the judicial authority shall strike from the record the testimony of the witness, and the trial shall proceed unless the judicial authority, in his discretion, upon motion of the defendant, determines that the interests of justice require that a mistrial be declared."

harmless in this case and that any disclosure at the earlier time would not have changed the result of the trial since it's available, the information is available to the defendant at this time." At the time the court made this ruling, the defendant had not yet finished his cross-examination of LeValley.

We agree with the trial court's conclusion that any impropriety on behalf of the state with regard to LeValley's date book was not prejudicial to the defendant.[11] The record reveals that the defendant knew of LeValley's statement prior to having the date book pages in his possession. He was provided with the pages while still engaged in the cross-examination of LeValley. Moreover, the cross-examination continued into the next day, affording the defendant an opportunity to examine the pages overnight. We cannot conclude that the prosecutor's tardiness in producing the statement, which the trial court deemed inadvertent, " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden* v. *Wainwright*, supra, 477 U.S. 181; *State* v. *Williams*, supra, 204 Conn. 539.

The defendant also argues that the state failed to disclose a statement made by Malchik in a report dated August 5, 1985. During his cross-examination, defense counsel questioned Malchik about the report, which concerned Malchik's interview of the defendant at the time he was first informed of his wife's death. Counsel asked Malchik, "Now, you also said, as I heard you, that you confronted Mr. Sherman with why would you tell [LeValley] to turn off the battery when you already

[11] The trial court had broad discretion in determining whether the state's failure to disclose statements pursuant to Practice Book § 752 was so prejudicial to the defendant as to require sanctions under Practice Book § 755. See *State* v. *Williamson*, 212 Conn. 6, 14, 562 A.2d 470 (1989); *State* v. *Shaw*, 185 Conn. 372, 386, 441 A.2d 561 (1981), cert. denied, 454 U.S. 1155, 102 S. Ct. 1027, 71 L. Ed. 2d 312 (1982).

apparently told your wife to do that on Friday night; isn't that what you confronted him with?" Malchik responded, "Yes." Counsel then asked if that fact was in his August 5, 1985 report. When Malchik responded that he believed so, counsel handed him a copy of the report to review. Malchik asserted that the document handed to him was not his full report, that a portion had been redacted.[12] The jury was excused, and the defendant moved for a mistrial pursuant to Practice Book § 755 on the ground that the redacted portion of the report constituted an undisclosed statement.

Defense counsel argued before the trial court, as he does now, that his failure to possess the redacted statement during his cross-examination of Malchik was prejudicial. Counsel had intended to challenge Malchik's credibility by establishing that he had never made note in his report of a fact that he now testified was there. The defendant argues that because the information in question was, in fact, in Malchik's report, Malchik's credibility was bolstered rather than undermined. Moreover, the defendant asserts that his defense counsel's credibility was harmed because the jury may have believed that counsel was attempting to trick Malchik by asking him to review a redacted report.

The trial court denied the defendant's motion for a mistrial, ruling that there was no election by the state not to comply with an order of the court in that there was not any court order "found by the court with regard to the particular report." Also, the court found a lack of prejudice because the redacted portion of the report did not contain what Malchik would have been looking for when it was handed to him for him to

---

[12] Malchik's report indicated that the defendant told Malchik that, when he called LeValley on August 4, 1985, he never asked her to ask his wife to turn off the battery "as [LeValley] states." Following this was the redacted portion, a parenthetical notation made by Malchik stating: "[LeValley] wrote same on a piece of paper—see her report."

review, "that is namely, some place where in his report he wrote down the fact that he confronted the defendant with the difference between the claims with regard to the phone call." When the jury was reconvened, the trial court specifically informed the jurors that defense counsel had not been in possession of the unredacted report during his previous cross-examination of Malchik.

We must conclude that the fairness of the trial was not compromised by the state's late production of the redacted statement. As the trial court found, the defendant was not prejudiced. His argument is that the actual presence of certain information in the report thwarted his efforts to challenge Malchik's credibility. This argument, however, is without merit in that the redacted statement did not constitute that information. Of more importance is that any injury to defense counsel's credibility was cured by the trial court's subsequent explanation to the jury that counsel had not possessed the full report when questioning Malchik. For these reasons, we find that the state's failure to disclose the challenged statements prior to the defendant's cross-examination of LeValley and Malchik did not constitute unconstitutional prosecutorial misconduct.

## D

The defendant's next claim is that he was deprived of a fair trial because the prosecutor, in his rebuttal closing argument, improperly commented on facts not in evidence. Through these comments, the defendant asserts, the prosecutor attempted to persuade the jury that he knew additional facts and witnesses who, if presented, could prove the defendant's guilt. The state responds that its comments were in rebuttal to the defendant's closing argument in which he referred to facts not in evidence to imply that the state police had inadequately investigated the murder. The state urges

that the gist of its remarks was not that it had other evidence to prove the defendant's guilt, but that there was other evidence not relevant to his guilt and that the verdict should be based solely on the evidence before the jury.[13]

After the jury was excused, the defendant objected to the state's comments and moved for a mistrial on the ground that they constituted prosecutorial misconduct. The trial court denied the motion, ruling that the comments did not "in the view of the court, rise to the level of requiring mistrial." The court thereafter instructed the jurors to consider only the evidence properly before them, which evidence did not include the arguments of the attorneys.

"While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury have no right to consider." *State* v. *Ferrone*, 96 Conn. 160, 169, 113 A. 452 (1921). "When a verdict is challenged

---

[13] In his closing argument, defense counsel asked the jury, "Are you satisfied with the quality of the investigation and what [the police] did or didn't do? [The prosecutor] says the issue is not what they didn't do. That is the central issue. Do you know why? In the first couple of hours after this body was found, they reached a conclusion as to who killed [the victim, the defendant.]" Defense counsel then delineated various types of evidence that the police could have collected, but did not because they assumed that the defendant was the murderer.

In rebuttal, the prosecutor stated: "[Defense counsel] has, on occasion, suggested to you items that are not in evidence. And I think His Honor will tell you, and I urge you, you cannot consider what is not in evidence. [Defense counsel] has suggested things to you to try to get your mind thinking about it. I cannot present to you evidence. There are certain witnesses that I could not present to you; there's evidence I could not present to you because it would not be relative to this case. And I'm not commenting one way or the other, except as to [the] investigation by the state police, there [are] other people that could possibly have been involved and the results of that investigation. That's not relevant to this case and could not be presented. Base your verdict on the evidence presented to you, I urge you."

on the basis of the prosecutor's allegedly prejudicial remarks, the defendant bears the burden of proving the remarks prejudicial in light of the whole trial." *State* v. *Floyd*, 10 Conn. App. 361, 364, 523 A.2d 1323, cert. denied, 203 Conn. 809, 525 A.2d 523, cert. denied, 484 U.S. 859, 108 S. Ct. 172, 98 L. Ed. 2d 126 (1987).

In considering this claim, we must adhere to the principle that "the action of the trial court is entitled to weight because of the vantage point from which it can observe and evaluate the circumstances of the trial. The trial court is in a better position to determine the propriety of the remarks of counsel and whether or not they are harmful. See *State* v. *Ubaldi*, supra, [190 Conn.] 563; *State* v. *McCall*, 187 Conn. 73, 77, 444 A.2d 896 (1982); *Downing* v. *State*, 178 Ind. App. 144, 152, 381 N.E.2d 554 (1978)." *State* v. *Glenn*, supra, 194 Conn. 493.

Our review of the trial transcript convinces us that the prosecutor's remarks were not improper. The defendant presents his argument to us using portions of the prosecutor's comments. When the prosecutor's comments are examined in toto, it becomes clear that the remarks did not constitute an assertion that the state was aware of additional evidence that could prove the defendant's guilt. Rather, in emphasizing to the jury that it must consider only evidence properly presented, the prosecutor claimed that he knew additional evidence that was irrelevant to proving the defendant's guilt and, consequently, had not been presented. Even were we to assume that the prosecutor's remarks were improper, we agree with the trial court that the defendant was not deprived of a fair trial. See *State* v. *Holder*, 18 Conn. App. 184, 191, 557 A.2d 553 (1989). "Additionally, the court instructed the jury that its verdict should be based only on the evidence and that the statements of counsel during closing argument did not constitute evidence. Those instructions served to diminish

the impact, if any, the remark[s] may have had on the jury. See *State* v. *Flinter*, 16 Conn. App. 402, 410, 548 A.2d 1 (1988)." Id. We conclude, therefore, that the defendant cannot prevail on this claim.

E

The defendant next claims that prosecutorial misconduct exists in the prosecutor's allegedly improper expressions of opinion as to the credibility of the defendant and a state's witness. "The prosecutor may not express his own opinion, either directly or indirectly, as to the credibility of witnessess. *United States* v. *Modica,* supra, [663 F.2d 1181]; *United States* v. *Drummond,* 481 F.2d 62 (2d Cir. 1973); *State* v. *Floyd,* [supra, 10 Conn. App. 365]; ABA Standards for Criminal Justice (Second), The Prosecution Function § 3-5.8 (b) (1985) . . . ." *State* v. *Williams,* supra, 204 Conn. 541. "The prosecutor may, however, argue to the jury that the *evidence* and the reasonable inferences to be drawn therefrom should lead the jury to a conclusion as to the credibility of witnesses. *United States* v. *Drummond,* [supra, 62]; *Harris* v. *United States,* 402 F.2d 656 (D.C. Cir. 1968)." (Emphasis in original.) *State* v. *Williams,* supra, 541 n.6. Moreover, in the context of cross-examination, a prosecutor is not prohibited from impeaching the credibility of a witness, as long as he refrains from expressing his own opinion of the witness' credibility.

The defendant first asserts that the prosecutor, during his nine and one-half day cross-examination of him, asked improper questions that were comments on his credibility. While the defendant objected to each question that he now challenges, he did not move for a mistrial or request a curative instruction. Although the defendant refers to twenty-five alleged incidents of improper questioning, a careful examination of the record reveals that, while a few were argumentative, none

of the challenged questions contained comments about the defendant's credibility. Cf. id., 523.

Even assuming the impropriety of these questions, however, we must consider them in the context of the entire trial and make a determination as to whether the fairness of the trial was compromised. In *State* v. *Williams*, supra, 204 Conn. 523, our Supreme Court concluded that the prosecutor had improperly expressed his opinion as to the credibility and guilt of the defendant. In so finding, the court noted that the prosecutor had expressed his opinion "frequently and vitriolically." This case presents neither the frequency, the virulence, nor the direct comment on truthfulness of the prosecutor's questions and remarks in *Williams*. Consequently, after reviewing the record, we conclude that the prosecutor's challenged questions did not deprive the defendant of a fair trial.

The defendant also argues that the prosecutor expressed his opinion as to the credibility of Kristen McDuff, a state's witness, during his closing argument. In reference to McDuff, the prosecutor stated, "I respectfully submit to you—I respectfully submit for your consideration, that that little girl told you the absolute truth when she told you that she ran in because she had asked first to use the phone."

The prosecutor's comment was an improper voucher of a state's witness' credibility. For this impropriety to warrant reversal, however, the defendant must demonstrate that the statement, even if prejudicial in isolation, undermined his right to a fair trial. See *State* v. *Glenn*, supra, 194 Conn. 497. We conclude that the defendant has failed to make such a demonstration. At the beginning of his closing argument, the prosecutor cautioned the jury that "[t]he credibility of witnesses is up to you to determine." He also stated, "In the

course of my argument, I might slip . . . I might use the words 'I believe.' And if I do use those words, please, immediately disregard them because what I believe is totally unimportant, it's immaterial." Following closing arguments, the trial court instructed the jury that it was to determine the credibility of the witnesses and to disregard any statements made by either lawyer as to the truthfulness of the witnesses.[14] Taking this curative instruction into account, we cannot conclude that, in the context of the entire trial, the prosecutor's improper remark affected the verdict.

## F

The defendant next claims that the state improperly injected extraneous matter into the trial and appealed to the jurors' emotions. First, he argues that the prosecutor made three statements during his closing argument that were extraneous and served to divert the jury's attention from its duty to decide the case on the evidence.[15] Following the prosecutor's closing argument, the defendant moved for a mistrial based on sev-

---

[14] The court instructed: "[B]efore I begin with what I've prepared as instructions on the law, I want to give you a cautionary instruction that has to do with the arguments that were made this morning by the attorneys. I observed with regard to each of the attorneys, that there were occasions when, under the exuberance of the moment you might have come to the conclusion that one of the attorneys or the other was giving you their opinion about the truthfulness of a witness. . . . And I want to instruct you if you did have that feeling from either of both of the lawyers, I want to tell you to disregard that comment that caused you to have that feeling, completely. Because whether a witness is to be believed or not to be believed, as I'll tell you in a few moments, is entirely up to you. . . . [T]he lawyer's opinion as to the truthfulness of a particular witness is not binding upon you. And it's entirely up to you to determine whether or not a witness' testimony should be accepted or not."

[15] The defendant challenges the following statements: (1) "I want to compliment [defense counsel] on his professional manner and competence. Sometimes, many times strengthened by [defense cocounsel]. I submit to you, I'm no match for them, you could see how astute they were in the presentation of this case"; (2) "[The defendant] has a high I.Q. I was no match for him"; and (3) "[Y]ou probably know that I only have one real winter suit."

eral alleged improper statements made during that argument, specifically including the first two statements challenged here. The trial court denied the motion for mistrial. During its instructions, the court directed the jury to consider only the evidence presented and not the arguments or expressed beliefs of the attorneys.

The defendant now maintains that the three challenged statements constituted a suggestion to the jurors that any reasonable doubt in their minds existed only because of the skill and superior resources of the defense counsel and the intelligence of the defendant. "[A] prosecutor should not inject extraneous issues into the case that divert the jury from its duty to decide the case on the evidence. ABA Standards [for Criminal Justice (Second)], supra, § 3-5.8." *State* v. *Williams*, supra, 204 Conn. 547. As to the first two statements, we conclude without commenting on their propriety that the trial court was correct in determining that the defendant was not prejudiced thereby. The prosecutor did not state to the jury that any existing doubt could be attributed to the superior skill, resources and intelligence of the defendant and his attorneys. Rather, the defendant asks us to draw that inference from what the prosecutor did say to the jury. Whether this is a reasonable inference and, if so, whether the jury may have actually drawn it to the prejudice of the defendant is a determination best left to the trial court, which occupied the best vantage point for such a determination. The court concluded that a mistrial was unnecessary on this claim and we discern no reason to upset its decision.

As to the prosecutor's statement about his winter suit, the defendant presents it to us out of context. At the beginning of his closing argument, the prosecutor stated, "Ladies and gentlemen of the jury . . . [y]ou sit here as twelve people, we've come to know each other to some extent, *you probably know that I only*

*have one real winter suit that I can wear.* But I have twelve minds, and I cannot see in your mind, and I have twelve minds to convince beyond a reasonable doubt that this defendant, Edward Sherman, is guilty . . . ." (Emphasis added.) The defendant did not object to this statement when it was made or in his motion for mistrial and exceptions following the closing argument. It is evident that the defendant took the statement at the time for what it was, an offhand remark intended to emphasize the familiarity between the jury and attorneys as a result of a four month long trial. We find no impropriety in this statement.

The defendant also argues that the prosecutor improperly appealed to the emotions of the jurors. During his cross-examination of the defendant, the prosecutor asked, "So tell us, your wife is bleeding [and goes] to the hospital and you buy an airline ticket to go to Illinois or to St. Louis, is that correct, the same day?" He also asked "Did you have enough sympathy for [your wife] on Tuesday to say, well, maybe I better keep away from [the woman with whom I'm having an affair] for a while to help [my wife] out for a little bit?" The defendant's objections to these two questions, on the basis that they were argumentative, were sustained. During closing argument, the state asked the jury to "[p]lease remember that [the victim] was a living vibrant human being until, I submit to you, she was killed by her husband . . . ." Also, on rebuttal argument, the prosecutor stated, "I had intended in my opening argument to apologize to [the victim] for having to present to you and to the world the privacy of her life." The defendant took no exception to these remarks.

"A prosecutor may not appeal to the emotions, passions and prejudices of the jurors. *United States* v. *Modica,* supra, [663 F.2d 1181]; *State* v. *Couture,* supra, [194 Conn. 564]; *State* v. *Carr,* 172 Conn.

458, 470, 374 A.2d 1107 (1977); *State* v. *Ferrone*, supra, [96 Conn. 160]; ABA Standards [for Criminal Justice (Second)], supra, § 3-5.8 (c)." *State* v. *Williams*, supra, 204 Conn. 545. "This does not mean that a prosecutor may not present arguments with logical force and vigor. See *Berger* v. *United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 [1935]. 'To attempt to spell out in detail what can and cannot be said in argument is impossible, since it will depend largely on the facts of the particular case.' ABA Standards, op. cit. § 5.8, commentary." *State* v. *Carr*, supra, 470.

In *State* v. *Williams*, supra, 204 Conn. 546, our Supreme Court found that the prosecutor had "repeatedly engaged in character assassination and personal attacks on both the defendant and his key witness . . . ." During cross-examination and closing argument, for example, the prosecutor repeatedly referred to the defendant as a "coward," "child-beater," "baby-beater," "infant-thrasher," "liar," "drunken drug-user, convicted felon, child-beater," "stupid," "savage child-beater," "drunken bum," "evil man," and "a drunk who uses cocaine and smokes marijuana and beats children." Id. In *State* v. *Couture*, supra, 194 Conn. 561, the court found that the prosecutor had repeatedly characterized the defendant and his codefendant as "murderous fiends," "rats," "utterly merciless killers" and "inhumane, unfeeling and reprehensible creatures." The defendant's objections to these remarks were overruled and his requests for curative instructions were denied. In both of these cases, the Supreme Court concluded that the prosecutors' persistent invective could reasonably have had the improper effect of appealing to the emotions and prejudices of the jury.

The case before us differs from both *Williams* and *Couture* in that it is unlikely that the four challenged

remarks, which were made during the course of the long trial, could have so inflamed the emotions of the jury as to have had an effect on its verdict. The defendant has not established that the remarks were in fact harmful. *State* v. *Carr*, supra, 172 Conn. 470. We conclude that the remarks, even if improper, did not impinge on the defendant's right to a fair trial.

## G

The defendant's final argument in support of his prosecutorial misconduct claim is that the state misrepresented to the court that it would call a certain witness. While placed under the rubric of prosecutorial misconduct, this argument is more properly characterized as a claim that the trial court improperly admitted into evidence testimony regarding a search of the Sherman residence on August 9, 1985.

The following facts are relevant to this claim. Late in the evening of August 5, 1985, the state police surrendered custody of the Sherman residence and the defendant returned home. On August 9, 1985, Malchik and other members of the state police searched the Sherman residence pursuant to a warrant. They seized, inter alia, a container of linguine and a container of red clam sauce from the refrigerator and took photographs of them. At trial, during the state's direct examination of Malchik, the prosecutor initially attempted to introduce the photographs and question Malchik as to the evidence seized. The court sustained the defendant's objection that the evidence was irrelevant.

Later in the trial, the state again offered the evidence and Malchik's testimony. In an oral offer of proof, the state argued that intervening testimony had established a foundation for relevance. The prosecutor referred to the fact that Galvin, who had performed the autopsy of the victim, had testified that linguine and clam sauce

were found in the stomach of the victim. He argued further that the fact that the containers of linguine and clam sauce were seized one week after the alleged time of death, and four days after the police surrendered custody of the house, went to the weight the jury should afford the evidence, not to its admissibility. In the course of his argument, the prosecutor stated, "If there is to be reasonable relevance of this evidence, and I claim the testimony of Dr. Galvin tied the relevance in, I also intend to call Dr. Carver if, in fact, this evidence is admitted." Carver had assisted in the autopsy and would testify, the state offered, that the linguine and clam sauce seized and shown to him by Malchik were similar to the substances found in the victim's stomach. The trial court overruled the defendant's objection.[16]

When the state rested without calling Carver as a witness, the defendant moved to strike Malchik's testimony regarding the August 9, 1985 search. Because Carver did not testify, the defendant claimed, the state failed to "connect up the [linguine and clam sauce] in any scientific way to [the victim]." After hearing from the state, the trial court denied the defendant's motion without comment. Subsequently, in his request to charge, the defendant asked for a missing witness charge based on the state's failure to call Carver. See *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 165 A.2d 598 (1960). The court gave no such instruction.

The defendant argues that the trial court improperly admitted Malchik's testimony, denied his motion to strike and failed to give the missing witness charge. "The trial court is given broad discretion in determin-

---

[16] In ruling, the court stated: "The court is more persuaded by the state's argument in this case that the cross-examination can bring out the weight that the jury wants to accord to this evidence. But after the admissibility, I am going to overrule the objection and permit the witness to testify and the exhibits to be introduced if they are properly authenticated."

ing the relevancy of evidence and its decision will not be disturbed absent a clear abuse of that discretion." *State* v. *Holliman*, 214 Conn. 38, 50, 570 A.2d 680 (1990). "Evidence is [relevant] when it tends to establish a fact in issue or to corroborate other direct evidence in the case. . . ." (Citations omitted; internal quotation marks omitted.) Id., quoting *Federated Department Stores, Inc.* v. *Board of Tax Review*, 162 Conn. 77, 82, 291 A.2d 715 (1971).

After reviewing the record, we conclude that the trial court did not abuse its discretion. The state had already presented evidence that the victim had consumed linguine and clam sauce not more than two hours prior to her death. Moreover, in his testimony as to his and the victim's actions before he left the house on August 2, 1985, the defendant made no mention of her eating linguine and clam sauce. Because both the time of death and the defendant's credibility were at issue, it was reasonable for the trial court to have concluded that the evidence seized from the Sherman's refrigerator was relevant. "Evidence is not rendered inadmissible simply because it is not conclusive. It is admissible if it tends to support a relevant fact even in a slight degree, so long as it is not prejudicial or merely cumulative." *State* v. *Morrill*, 197 Conn. 507, 548, 498 A.2d 76 (1985). The trial court admitted the challenged evidence, therefore, because it was relevant. Consequently, the court properly refused to strike the evidence following the state's failure to call Carver and refused to give a missing witness charge.

The defendant also contends that we should view the state's representation to the trial court that it would call Carver and its subsequent failure to do so as prosecutorial misconduct. We disagree, however, that the state's announcement of its intent to call Carver constituted misconduct. During the offer of proof, the state did not promise to call Carver in the future so as to

establish the relevance of the disputed evidence. Rather, it indicated its intention to call Carver "if, in fact, this evidence is admitted." Also, it is not apparent that the trial court relied on the prosecutor's representation that he would call Carver when it ruled that the evidence was admissible. The court based its ruling on the fact that Galvin had testified as to the evidence and did not indicate to the defendant that it would entertain a motion to strike if Carver was not presented as a witness. In any event, Carver's testimony would have been, at best, cumulative of Galvin's testimony.

In examining each of the defendant's seven claims of prosecutorial misconduct, we conclude that the challenged conduct either was not improper or, if inappropriate, did not so infect the trial with unfairness as to make the defendant's resulting conviction a denial of due process. We reach the same conclusion after considering the instances of alleged impropriety cumulatively. In the context of this lengthy trial, the aggregate effect of the state's misconduct cannot be said to have undermined the fairness of or have affected the outcome of the trial.

## II

### EXPERT OPINION AS TO TIME OF DEATH

The defendant next claims that the trial court improperly admitted into evidence expert opinion testimony regarding the time of death. Specifically, he argues that Galvin, who testified on behalf of the state, should not have been permitted to offer her opinion as to the time of the victim's death in that her opinion was based on assumptions and unreliable methodology.

The time of death was a critical issue at the defendant's trial. Galvin, chief medical examiner for the state, initially determined that the time of death was twenty-

four to thirty-six hours prior to her observation of the body at 7 a.m. on August 5, 1985. This estimate exculpated the defendant, who had left on his trip over sixty hours prior to that time. After taking into account the fact that Fredriksen, who had discovered the body, described the temperature of the room as "very cold, like a refrigerator," Galvin redetermined the time of death to be between forty-eight and ninety-six hours prior to her observation.

The defendant unsuccessfully objected to the admission of Galvin's opinion as to time of death at the probable cause hearing. Thereafter, he filed a motion in limine, seeking to preclude its admission into evidence at the trial. During trial, outside the presence of the jury, the court held a lengthy hearing on the motion, during which the state presented Galvin's testimony as to how she had formed her opinion. On direct and cross-examination, Galvin testified that unless there is a witness to the death, only a range of time can be given with medical probability. The further removed the examiner's observation is from the time of death, the greater the range. Galvin testified that she based her initial opinion primarily on the degree of rigidity that she observed during her autopsy of the victim. She explained that rigidity is an ongoing process that occurs at a given rate. Under average room temperatures, between sixty-eight and seventy degrees Fahrenheit, rigidity is fully developed approximately twelve hours after death and persists for approximately another twelve to twenty-four hours before beginning to subside. On the average, rigidity begins to lessen between twenty-four to thirty-six hours after death. Full rigidity has been known to last longer in some cases, including as long as sixty hours in one recorded case. Galvin testified that these average rates of the onset and diminuation of rigidity are taught in forensic pathology classes.

Galvin further testified that she changed her estimate as to time of death after being informed that the room was very cold. She stated that in cooler than normal temperatures, a body becomes rigid more slowly and maintains rigidity for a longer period before beginning to subside. While it is an understood fact in the field of forensic pathology that colder temperatures retard the rate of rigidity, there are no established standards such as those she had described for the rate of rigidity in normal room temperatures. Consequently, she explained, the effect of cold is a relative consideration, which in this case she based on her personal experience, personal communications and literature. When told that the room in which the body had been discovered was "very cold, like a refrigerator," Galvin interpolated that to mean that "the room could have been as cold as [forty to forty-five degrees], may not have been as cold as that, but was markedly colder than the area outside the room." Following the offer of proof and argument, the trial court denied the defendant's motion in limine, finding that the state had met its burden of proving the necessary foundation for Galvin's opinion as to the time of death.

The defendant first contends that Galvin's opinion was based on unsubstantiated assumptions due to the uncertainty regarding the temperature of the room in which the victim's body was found. Because Galvin did not know the actual temperature of the room or whether the air conditioner was capable of cooling the room to approximately forty degrees, the defendant maintains that she did not have the necessary factual basis to render an admissible opinion.

" 'The trial court has wide discretion in ruling on the qualification of expert witnesses and the admissibility of their opinions. State v. Girolamo, 197 Conn. 201, 214, 496 A.2d 948 (1985); State v. Biller, 190 Conn. 594, 617, 462 A.2d 987 (1983).' State v. Kemp, 199 Conn. 473,

476, 507 A.2d 1387 (1986). The exercise of such discretion is not to be disturbed unless it has been abused or the error is clear and involves a misconception of the law. *State* v. *Palmer*, 196 Conn. 157, 166, 491 A.2d 1075 (1985); *State* v. *Asherman*, 193 Conn. 695, 716, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985); *State* v. *Biller*, supra [617]; *State* v. *Wilson*, 180 Conn. 481, 489–90, 429 A.2d 931 (1980); *Going* v. *Pagani*, 172 Conn. 29, 35, 372 A.2d 516 (1976); *State* v. *Elliott*, 8 Conn. App. 566, 572, 513 A.2d 1285, cert. denied, 201 Conn. 813, 517 A.2d 630 (1986). 'In order to render an expert opinion the witness must be qualified to do so and there must be a factual basis for the opinion.' *State* v. *Asherman*, supra [716]. The essential facts on which an expert opinion is based are an important consideration in determining the admissibility of his opinion. See *Berndston* v. *Annino*, 177 Conn. 41, 46, 411 A.2d 36 (1979); *Sears* v. *Curtis*, 147 Conn. 311, 314–15, 160 A.2d 742 (1960). 'Where the factual basis of an opinion is challenged the question before the court is whether the uncertainties in the essential facts on which the opinion is predicated are such as to make an opinion based on them without substantial value.' *State* v. *Asherman*, supra, 716–17. That question is one of fact for the trial court. *Liskiewicz* v. *LeBlanc*, 5 Conn. App. 136, 141, 497 A.2d 86 (1985)." *State* v. *Douglas*, 203 Conn. 445, 452–53, 525 A.2d 101 (1987).

We cannot conclude that the trial court abused its discretion in finding that Galvin's opinion was based on an adequate factual predicate. Galvin based her estimate on her direct observation of the body and information concerning the temperature of the room in which the body was found. She utilized her expertise, which is not challenged, to arrive at assumptions regarding the temperature of the room and the effect that temperature would have on the rate of rigidity of

the body. The trial court was not incorrect in finding that the uncertainties underlying Galvin's opinion did not render it "without substantial value." Cf. *Going* v. *Pagani*, supra, 172 Conn. 33–34. Consequently, the uncertainties in this case go to the weight to be afforded Galvin's opinion, not its admissibility. See *State* v. *Asherman*, supra, 193 Conn. 718.

The defendant also asserts that Galvin's opinion as to time of death was inadmissible because it was based on unreliable and unscientific methodology. Connecticut courts utilize "the *Frye* standard in appraising the admissibility of evidence derived from innovative scientific techniques." *Moore* v. *McNamara*, 201 Conn. 16, 30, 513 A.2d 660 (1986). In *Frye* v. *United States*, 293 F. 1013, 1014 (D.C. App. 1923), the court stated: "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well recognized scientific principle or discovery, that from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."[17]

---

[17] "The *Frye* 'general acceptance' test has been employed to assess the admissibility of spectrographic voice analysis; *People* v. *Kelly*, 17 Cal. 3d 24, 549 P.2d 1240, 130 Cal. Rptr. 144 (1976); *Commonwealth* v. *Lykus*, 367 Mass. 191, 327 N.E.2d 671 (1975); ion microprobic analysis of hair samples; *United States* v. *Brown*, 557 F.2d 541 (6th Cir. 1977); and hypnotically refreshed recollection. *People* v. *Shirley*, 31 Cal. 3d 18, 641 P.2d 775, 181 Cal. Rptr. 243, cert. denied, 459 U.S. 860, 103 S. Ct. 133, 74 L. Ed. 2d 114 (1982). . . . [Our Supreme Court] has expressly applied it to polygraph testing; *State* v. *Miller*, 202 Conn. 463, 484, 522 A.2d 249 (1987); and to human leukocyte antigen testing for paternity. *Moore* v. *McNamara*, supra, [201 Conn. 30]. [The court] has also applied the 'general acceptance' standard, without reference to *Frye*, in *State* v. *Mitchell*, 169 Conn. 161, 169–70, 362 A.2d 808 (1975) (polygraph testing), *Molino* v. *Board of Public Safety*, 154 Conn. 368, 376–77, 225 A.2d 805 (1966) (polygraph testing),

We do not, however, apply the *Frye* test to all types of expert testimony, even if technical or scientific concepts are involved. *State* v. *Borrelli*, 227 Conn. 153, 165, 629 A.2d 1105 (1993). "The *Frye* test finds its rational basis in the degree to which the trier of fact must accept, on faith, scientific hypotheses capable of proof or disproof in court and not even generally accepted outside the courtroom. . . . *Frye* contemplates those situations in which the evidence sought to be admitted is beyond the understanding of the ordinary juror who must sacrifice his independent judgment in deference to the expert. . . . Among the dangers created by such scientific evidence is its potential to mislead lay jurors awed by an aura of mystic infallibility surrounding scientific techniques, experts and the fancy devices employed. . . . The fact that a technique or method has gained general acceptance in the scientific community to which it belongs tends to ensure that the jury will not accord undue weight to theories whose validity has not been adequately tested. . . .

"Such infirmities do not inhere in all types of expert evidence. Accordingly, the *Frye* test has been either ignored or rejected in cases in which the method used by the expert was a matter of physical comparison rather than scientific test or experiment . . . the basic data upon which the expert relied was verifiable by the factfinder . . . or where established techniques were applied to the solution of novel problems. . . . In such cases, the jury is in a position to weigh the probative value of the testimony without abandoning common sense and sacrificing independent judgment to the expert's assertions based on his special skill or knowledge. . . . Furthermore, where understanding of the method is accessible to the jury, and not dependent on familiarity with highly technical or obscure scientific

and *State* v. *Tomanelli*, 153 Conn. 365, 370, 216 A.2d 625 (1966) (police radar)." *State* v. *Hasan*, 205 Conn. 485, 489–90, 534 A.2d 877 (1987).

theories, the expert's qualifications, and the logical bases of his opinions and conclusions can be effectively challenged by cross-examination and rebuttal evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Hasan,* 205 Conn. 485, 490–91, 534 A.2d 877 (1987).

Because Galvin's testimony falls within this category, we conclude that the trial court did not abuse its discretion in admitting it into evidence. Galvin's methodology might be described as follows: She applied the generally accepted principle that colder temperatures slow the rate of rigidity to her personal observations of the rate of rigidity in bodies stored in her morgue refrigerator and her general expertise in forensic pathology to arrive at an estimated range of time in which the death might have occurred. In other words, because she knew that cold decelerates the rigidity process, but did not know the exact rate of the slowing effect, she developed a hypothesis as to the effect the cold temperature had in this case. The defendant does not take issue with the fact that medical examiners regularly render opinions as to time of death without knowledge of all the predicate facts, as long as their opinions constitute estimates within a range of time. The general method of applying assumptions derived from uncertain information to known facts to arrive at an opinion as to time of death is not an innovative technique for medical examiners. The defendant also does not, and cannot, challenge the fact that experts agree that temperature affects the rate of rigidity. The defendant is not claiming that Galvin accounted for environmental data but challenges the accuracy of her opinion as to how much the colder temperature affected the rate of rigidity in this case. The weight to be accorded Galvin's estimate, however, is something the jury could determine because direct and cross-examination revealed that her estimate as to the effect of the temperature was a hypothesis and not depen-

dent on established standards. The jury's understanding of this fact, and of Galvin's method, was "not dependent on familiarity with highly technical or obscure scientific theories . . . ." Id., 491. Thus, because the jury was in a position to weigh the probative value of the testimony without abandoning common sense and sacrificing independent judgment, we conclude that the trial court did not abuse its discretion in admitting Galvin's testimony into evidence. See id., 491.

III

EXCLUSION OF DEFENDANT'S EXPERT'S OPINION

The defendant next claims that the trial court improperly excluded his expert's opinion as to the time of death because of an alleged violation of a sequestration order. He argues that the court's preclusion of this testimony was a "draconian penalty" that deprived him of his constitutional right to present a defense and to confront an adverse witness. As a subsidiary argument, the defendant also challenges the trial court's ruling that the sequestration order was violated.

The following additional facts are relevant to this claim. At the commencement of trial, at the request of both the defendant and the state, the court entered a sequestration order pursuant to Practice Book § 876[18] and General Statutes § 54-85a.[19] During its case, the defense called Louis Roh, a forensic pathologist, to rebut the testimony of Galvin and to offer an opinion as to time of death. Roh testified generally as to his

[18] Practice Book § 876 provides: "The judicial authority upon motion of the prosecuting authority or of the defendant shall cause any witness to be sequestered during the hearing on any issue or motion or during any part of the trial in which he is not testifying."

[19] General Statutes § 54-85a provides: "In any criminal prosecution, the court, upon motion of the state or the defendant, shall cause any witness to be sequestered during the hearing on any issue or motion or any part of the trial of such prosecution in which he is not testifying."

qualifications and the factors considered by forensic pathologists in estimating time of death. When the defendant asked Roh about a photograph of the victim, the state objected and requested that the jury be excused.

The state then moved that Roh be prohibited from testifying as to substantive matters due to a violation of the sequestration order on the part of the defendant. The defendant acknowledged that before he testified, Roh had been provided with the transcript of Galvin's trial testimony. Following argument, the trial court ruled that the defendant had violated the sequestration order and, consequently, that Roh would be precluded from testifying as to substantive matters. The defendant inquired if Roh would be permitted to continue testifying "in an academic sense" as he had before the state's objection. The court stated that such testimony was not barred by the ruling. The defendant then continued his direct examination, during which Roh testified generally and at length about issues raised in Galvin's testimony. For example, Roh testified as to the manner in which medical examiners consider lividity, rigidity, decomposition and room temperature when estimating time of death.

"The primary purpose of a sequestration order is to ensure that the defendant receives a fair trial by preventing witnesses from shaping their testimony to corroborate falsely the testimony of others. *State* v. *Pikul*, 150 Conn. 195, 200, 187 A.2d 442 (1962)." *State* v. *Crumble*, 24 Conn. App. 57, 61, 585 A.2d 1245, cert. denied, 218 Conn. 902, 588 A.2d 1077 (1991). "Expert witnesses are not excepted under either the rule of practice or the statute and may be sequestered. *State* v. *Falby*, 187 Conn. 6, 27, 444 A.2d 213 (1982)." *State* v. *Soltes*, 20 Conn. App. 342, 346, 566 A.2d 1374 (1989), appeal dismissed, 215 Conn. 614, 577 A.2d 717 (1990). " 'An inquiry into the facts and circumstances of each

case is necessary to ascertain whether the purpose of a sequestration order has been thwarted.' " *State* v. *Crumble,* supra, 61, quoting *State* v. *Scott,* 16 Conn. App. 172, 182, 547 A.2d 77, cert. denied, 209 Conn. 821, 551 A.2d 758 (1988).

Turning first to the defendant's claim that the trial court incorrectly found a violation of the sequestration order, we conclude that the court was correct in its determination. There is no dispute that the defendant furnished Roh with the transcript of Galvin's trial testimony before Roh took the stand. In *State* v. *Falby,* supra, 187 Conn. 26, our Supreme Court held that "[t]he state's conduct in providing witnesses barred from the courtroom during . . . testimony with a verbatim transcript of that testimony was a clear violation of any sequestration order, narrow or broad, and the trial court erred in finding otherwise." In light of the purpose of sequestration orders, stated previously, we conclude that the court's reasoning in *Falby* is equally applicable here.

The defendant also challenges the sanction that the court imposed for the violation of the sequestration order. "The remedy for such a violation rests in the trial court's discretion, guided by a primary concern for 'the fairness of the trial, not the culpability of the [offender].' *Smith* v. *Phillips,* 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982); *State* v. *Cosgrove,* 186 Conn. 476, 488–89, 442 A.2d 1320 (1982)." *State* v. *Falby,* supra, 187 Conn. 27. The defendant claims that the trial court abused its discretion when it imposed a sanction that deprived him of his constitutional right to present a defense and to confront an adverse witness. We disagree.

The court did not exclude all of Roh's testimony. He was permitted to testify extensively as to matters relevant to determining time of death. Toward the goal of

rebutting Galvin's general testimony and her methodology in determining the victim's time of death, such testimony was valuable to the defendant. Roh was prevented from offering an opinion as to time of death contrary to Galvin's. The defendant, however, had the opportunity, through his direct examination of Roh and defense expert Kenneth Elovitz, a professional engineer, and his cross-examination of Galvin, to undermine Galvin's opinion. The defendant also had the opportunity, which he failed to utilize, to engage another expert witness pathologist to testify on the subject of time of death. We are satisfied in this case that the trial court did not abuse its discretion in excluding Roh's opinion as to time of death.

## IV

### ADMISSION OF HEARSAY STATEMENTS

The defendant next claims that the trial court improperly admitted into evidence hearsay statements, allegedly made by the victim, under the state of mind and catchall exceptions to the hearsay rule.

During its case-in-chief, out of the presence of the jury, the state made an offer of proof as to questions it intended to ask regarding discussions the victim had had with various witnesses in which she expressed, inter alia, her feelings concerning her relationship with the defendant, her knowledge that the defendant had been having an affair with Nancy Prescott, that Prescott had had a baby by the defendant, that she was going to have a baby and details the stormy status of her relationship with the defendant. The defendant objected to the admission of such testimony on the basis that it would be hearsay.

Following argument, the trial court generally overruled the objection on the basis of the state of mind and residuary exceptions to the hearsay rule. Because

the court found that the offer of proof was "all over the lot" and that the various rules of law applicable to the different proposed statements were "claimed and reviewed in somewhat of a garbled, mixed way," it specified that it was "going to require that the parties particularize their objections as the evidence comes in . . . . I don't want the defense to be limited with regard to their objections. The only thing that I will ask is that if you just indicate it's the same basis, then we won't have to renew the legal arguments attendant to the offers from time to time." Subsequently, during the state's direct examination of four witnesses, the defense objected to individual questions on the basis of hearsay, which objections were overruled by the court.

The defendant claims that all of the victim's statements were inadmissible under the state of mind exception to the hearsay rule. He asserts that the state actually offered the statements to show his motive, rather than the victim's state of mind. He also argues that the statements could not be admitted under the catchall exception because they lacked the requisite indicia of reliability and were not reasonably necessary. See C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 11.25.

In making these general allegations of error, however, the defendant has not complied with the requirements of Practice Book § 4065 (d) (3).[20] This seriously

---

[20] The defendant does not direct us to any specific questions or claimed improper rulings, but instead refers us generally to the trial transcript of the direct testimony of the four pertinent witnesses, which covers over 100 pages. " 'When raising evidentiary issues on appeal, all briefs should identify clearly what evidence was excluded or admitted, where the trial counsel objected and preserved his rights and why there was error.' *Aspiazu* v. *Orgera*, 205 Conn. 623, 636–37 n.5, 535 A.2d 338 (1987). The mere assertion in a brief that the evidence was improperly excluded, coupled with transcript page references, will not be sufficient. *State* v. *Russell*, 29 Conn. App.

limits our review because, although we know that the general basis for the defendant's objection as to admissibility of statements that showed state of mind is relevancy, we are not obligated to examine over 100 pages of testimony to determine which questions were proper and which were not. Regardless, we conclude that even if the trial court improperly admitted each challenged hearsay statement, the defendant has failed to prove that the admission of any one of them was harmful. See *State* v. *Moody*, 214 Conn. 616, 629, 573 A.2d 716 (1990). Our review of the pertinent transcript reveals that each question to which the defendant objected on the basis of hearsay related to the subject matter referred to by the state in its offer of proof. All of this evidence was offered to show the deteriorated relationship between the defendant and the victim. In this respect, there was an abundance of evidence already before the jury as to the stress between the Shermans and many of the challenged questions sought to elicit specific facts already in evidence.

59, 63, 612 A.2d 809, cert. denied, 224 Conn. 908, 615 A.2d 1050 (1992). It has long been our strong policy that if evidentiary rulings claimed to be improper are to be reviewed by this court, they must be set forth in the briefs as required and outlined by the rules of practice. Id.; *State* v. *Siller*, 12 Conn. App. 395, 402, 530 A.2d 1106, cert. denied, 205 Conn. 811, 532 A.2d 586 (1987)." *State* v. *Bagley*, 35 Conn. App. 138, 145, 644 A.2d 386, cert. denied, 231 Conn. 913, 648 A.2d 157 (1994).

Moreover, our review of the record indicates that the defendant objected on the basis of hearsay numerous times during the state's examination of each of the four witnesses. The defendant does not, however, direct us to the admitted testimony that he claims failed to satisfy the state of mind exception and failed to come under the residuary exception. Also, the trial court in each instance overruled the objection without stating the basis for its ruling. We are thus left to speculate as to whether the trial court admitted the testimony as a statement that fell under the state of mind exception or the catchall exception, or because it did not constitute hearsay at all. It is not our role "to guess at possibilities, but to review claims based on a complete factual record developed by a trial court." (Internal quotation marks omitted.) *State* v. *Hoeplinger*, 27 Conn. App. 643, 647, 609 A.2d 1015, cert. denied, 223 Conn. 912, 612 A.2d 59 (1992).

## V

### POSTVERDICT MOTIONS

The final issue in this appeal is whether the verdict was so clearly against the manifest weight of the evidence that the trial court improperly denied the defendant's motion for a new trial.[21] The defendant, relying on *State* v. *Hammond*, 221 Conn. 264, 604 A.2d 793 (1992), argues that because the verdict contradicts undisputed physical and mechanical facts, his conviction cannot stand.

"Appellate review of a trial court's decision granting or denying a motion for a new trial must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided. . . . [We] have accordingly confined our role to a determination of whether there has been an abuse of discretion." Id., 269–70.

"One cogent reason for overturning the verdict of a jury is that the verdict is based on conclusions that are physically impossible. '[A] verdict should be set aside "[w]here testimony is thus in conflict with indisputable physical facts, the facts demonstrate that the testimony is either intentionally or unintentionally untrue, and leave no real question of conflict of evidence for the jury concerning which reasonable minds could reasonably differ." *Budaj* v. *Connecticut Co.*, 108 Conn. 474, 476, 143 A. 527 (1928).' *State* v. *Avcollie*, [178 Conn. 450, 457, 423 A.2d 118 (1979), cert. denied, 444 U.S. 1015, 100 S. Ct. 667, 62 L. Ed. 2d 645 (1980)]." Id., 268.

In *State* v. *Hammond*, supra, 221 Conn. 264, it was undisputed, based on uncontroverted blood typing and

---

[21] The defendant also contends that the trial court improperly denied his motion for judgment of acquittal. Beyond his mere assertion that "[j]udgment of acquittal is proper when the state fails to present sufficient evidence, if found credible by the jury, to sustain a conviction," the defendant provides no factual or legal analysis to support his claim. We, therefore, deem this claim abandoned. See *State* v. *Yopp*, 35 Conn. App. 740, 750, 646 A.2d 298 (1994).

DNA evidence, that it was physically impossible for the defendant to have committed the sexual assault in question. The case at hand is distinguishable in that, contrary to the defendant's claim, the scientific facts upon which he relies were not indisputable such as to " 'leave no real question of conflict of evidence for the jury concerning which reasonable minds could reasonably differ.' " Id., 268.

The defendant argues that the state's theory of guilt in this case is premised on physically impossible facts and conclusions regarding the time of death. He first asserts that the "unrebutted and unchallenged testimony" of Elovitz established that it was mechanically impossible for an air conditioner similar to that in the defendant's bedroom to lower the room temperature below seventy degrees. He also maintains that Roh's testimony established that after two and one-half days, the time claimed by the state to have elapsed between the time of death and the fetal autopsy, a fetus would have shown a more advanced condition of maceration than it did.

The defendant, however, mischaracterizes the disputability of the conclusions to be drawn from this evidence. Elovitz' testimony related to a theoretical air conditioner similar in size and capacity to the air conditioner in the defendant's bedroom, operating properly under normal conditions. Also, the state produced testimony from various witnesses from which the jury could have inferred that, notwithstanding Elovitz' testimony, the bedroom temperature was considerably lower than normal.

Roh's testimony concerning the maceration of the fetus was derived from his interpretation of the underlying autopsy data. Roh explained on cross-examination that much of his testimony on direct examination was premised on a live mother and dead fetus and that fac-

tors such as a dead mother and room temperature could affect the maceration rate of the fetus. Moreover, Roh, who did not perform the autopsy, testified that pathology is an inexact science. Such evidence is not the type "that renders prior expert opinions as to the [time] of death scientifically impossible or improbable. Indeed, if it were, '[t]he ultimate result would be a never-ending battle of [pathologists] appointed [or retained] as experts for the sole purpose of discrediting a prior [pathologist's] diagnosis.' *Silagy* v. *Peters*, 905 F.2d 986, 1013 (7th Cir. 1990), cert. denied, 498 U.S. 1110, 111 S. Ct. 1024, 112 L. Ed. 2d 1106 (1991)." *Summerville* v. *Warden*, 229 Conn. 397, 437, 641 A.2d 1356 (1994).

We conclude that the facts relied on by the defendant do not establish that the state's theory of guilt, as premised on its theory of time of death, was physically impossible. Consequently, we cannot say that the trial court abused its broad discretion in denying the defendant's motion for a new trial.

The judgment is affirmed.

In this opinion the other judges concurred.